SEALED

*ORIGINAL*

# 2S130810

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2021 APR 15  PM 1:11

DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF FLORIDA *ex rel.* OMNI HEALTHCARE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> STEWARD HEALTH CARE SYSTEM LLC; STEWARD HEALTH CARE HOLDINGS LLC; STEWARD HEALTH CARE INVESTORS, LLC; CEREBRUS CAPITAL MANAGEMENT, L.P.; STEWARD PHYSICIAN CONTRACTING, INC; STEWARD MELBOURNE HOSPITAL, INC d/b/a MELBOURNE REGIONAL MEDICAL CENTER; STEWARD ROCKLEDGE HOSPITAL, INC. d/b/a ROCKLEDGE REGIONAL MEDICAL CENTER; RALPH DE LA TORRE; MICHAEL CALLUM; DANIEL KNELL; JOSH PUTTER; TIM CROWLEY and JAMES RENNA, <br><br> Defendants. | **3-21CV0870-S** <br><br> CASE NO.: <br><br> **FILED *IN CAMERA* AND UNDER SEAL** <br><br> **DO NOT PLACE ON PACER** |

---

## *QUI TAM* COMPLAINT

---

Relator Omni Healthcare, Inc. ("Omni" or "Relator"), on behalf of the United

States and the State of Florida, brings this action against the above-named

1

Defendants for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

("FCA"), the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*, the Anti-Kickback

Statute, 42 U.S.C. § 1320a-7b ("AKS"), and the Stark Act, 42 U.S.C. § 1395nn

("Stark").

## INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the

United States arising from false and/or fraudulent statements, records and claims

made by Defendants. The allegations involve the manipulation of physician

compensation to reward doctors for the value and volume of their referrals, in

violation of the FCA, AKS and Stark statutes.

2.      Publicly, the country's largest for-profit hospital chain promoted its

"strategic partnership" with a tiny Brevard County, Florida company as part of a

plan to reduce healthcare costs throughout its sprawling nationwide network.

Privately, executives at Steward Health Care System LLC ("Steward") characterized

the purchase of a 15 percent stake in First Choice Health Care Solutions, Inc. ("First

Choice") in starkly different terms: a no-brainer investment to drive an estimated

$150 million in business to its three faltering Central Florida hospitals.

3.      The financial projections led Steward to pay as much as a 50 percent

premium for First Choice's stock, pledge to build four new operating rooms and

promise to transfer millions of dollars of Steward's existing business to First

Choice—all in exchange for referrals.

4.      Together, executives at Steward and First Choice worked to divert the least profitable operations to competitors, tracked the number of procedures performed and directed by First Choice doctors to Steward hospitals, calculated how many more surgeries could be referred, monitored progress on a weekly basis, and tallied up the increased revenue.

5.      As explained in greater detail herein, Defendants' worked together to engage in the above-mentioned practices, which purposefully led to the billing of federal and state health care claims which were tainted by violations of AKS and Stark, and which violated the FCA.

6.      The FCA provides that any person who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of 5,500 to $11,000 for each such claim submitted on or before November 2, 2015 and $10,781 to $21,563 for each such claim submitted after November 2, 2015, as well as three times the amount of the damages sustained by the Government. The FCA permits persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal, without service on the defendants. The complaint remains under seal while the Government conducts an investigation of the complaint's allegations and determines whether to join the action.

7.      Pursuant to the FCA, Relator seeks to recover on behalf of the United States damages and civil penalties arising from Defendants' violations of the Stark

and AKS statutes and purposeful submission of false and/or fraudulent claims to the Government.

## PARTIES

8.  The United States and the State of Florida are real parties of interest in this action.

9.  Relator Omni Healthcare, Inc. is a multi-specialty physician group based in Brevard County, Florida. Relator operates in central Florida and specializes in the fields of internal medicine, surgery, pediatrics, family practice and many medical and sub-specialties. The facts alleged within are based on the personal observation of Relator Omni's principal, as well as documents and information in his possession. The information and observations led Relator to question Defendants' fraudulent actions.

10.  Defendant Steward Health Care System, LLC ("Steward") is a Delaware limited liability corporation. It invested $7.5 million when it purchased 15% of Defendant First Choice stock on February 6, 2018. At the time of the stock purchase, Steward was headquartered in Boston. Steward was an affiliate of Defendant Cerberus Capital Management, L.P. until June 2020, when a group of physicians led by Dr. Ralph de la Torre bought control. Steward operates in nine states. The sole member of Steward is Defendant Steward Health Care Holdings, LLC.

11.  Defendant Steward Health Care Holdings, LLC ("Steward Holdings") is a Delaware limited liability corporation. It holds all of Defendant Steward's

4

outstanding common membership interests. Each membership interest represents the holder's interest in net profits, losses and distributions by the healthcare system.

12. Defendant Steward Health Care Investors, LLC, a Delaware limited liability company, holds all of the membership interests in Steward Holdings. At the time of the actions described herein, it was a controlled affiliate of Defendant Cerberus Capital Management, L.P.

13. Defendant Cerberus Capital Management, L.P. ("Cerberus") is a Delaware limited partnership founded in 1992. At the time of the actions described herein, Defendant Steward was an affiliate of Defendant Cerberus. It has 18 affiliated advisory offices located in the United States, Europe, Asia, Africa, South America and Australia. The principal owner is Stephen A. Feinberg. As of January 1, 2020, Cerberus had about $61.3 billion of regulatory assets under management.

14. Defendant Steward Physician Contracting, Inc. ("Steward Physician"), a taxable, non-profit Massachusetts corporation, is a subsidiary of Steward Medical Group, Inc. Pursuant to the terms of the stock purchase agreement, Defendant Steward designated Steward Physician Contracting to receive the 5 million shares purchased from Defendant First Choice. Defendant Steward is the direct parent of Steward Medical Group and the indirect parent of Defendant Steward Physician.

15. Defendant Steward Melbourne Hospital, Inc. d/b/a Melbourne Regional Medical Center ("Melbourne Regional") is a Delaware corporation formed on February 9, 2017. It is a 119-bed hospital located in Melbourne, Florida. It was formerly called Wuesthoff Health System-Melbourne.

5

16.     Defendant Steward Rockledge Hospital, Inc. d/b/a Rockledge Regional Medical Center ("Rockledge Regional") is a Delaware corporation formed on February 15, 2017. It is a 298-bed hospital located in Rockledge, Florida. It was formerly called Wuesthoff Health System-Rockledge.

17.     Defendant Steward Sebastian River Medical Center, Inc. d/b/a Sebastian River Medical Center ("Sebastian River Medical") is a Delaware corporation formed on February 15, 2017. It is a 154-bed facility.

18.     Defendant Ralph de la Torre is the founder, chairman and Chief Executive Officer of Steward Health Care System. He has served as chairman and CEO since 2010.

19.     Defendant Michael Callum is the President of Steward Medical Group and Executive Vice President for Physician Services.

20.     Defendant Daniel Knell is a regional Vice President for Steward Health Care.

21.     Defendant Josh Putter was the President of the central division of Steward Health Care from March 2017 through August 2018. He is now the President of Steward Health Care International- Columbia.

22.     Defendant Tim Crowley is a Senior Vice President of Physician Network Development at Steward Health Care.

23.     Defendant James Renna has been a board member of First Choice Healthcare Solutions, Inc. since 2018. He was the lead financial executive at Cerberus Capital Management, L.P. from May 2006 through May 2018.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

25.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in the Northern District of Texas.

26.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because all Defendants can be found in, reside in and/or have transacted business in the Northern District of Texas.

27.     Relator knows of no other FCA complaints that have been filed against Defendants alleging the same or similar actions for the time period at issue. Additionally, Relator is an original source as defined in 31 U.S.C. § 3730(e)(4)(B). Relator made voluntary disclosures to the United States prior to the filing of this lawsuit.

## REGULATORY OVERVIEW

### The Federal and Florida False Claims Acts

28.     The False Claims Act, 31 U.S.C. §§ 3729 *et seq.* reflects Congress' objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345 at 1 (1986). As relevant to this case, the FCA establishes liability for an individual or entity that:

> (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or

7

(B)     knowingly makes, uses, or causes to be made or used, a false

record or statement material to a false or fraudulent claim.

31 U.S.C. § 3729(a)(1).

29.     The FCA defines "knowing" and "knowingly" to mean that a person with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required and an innocent mistake is not a defense to an action under this act. *Id.*

30.     In addition to treble damages, the FCA provides for the assessment of civil penalties for each violation.

31.     The Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*, is modeled after the Federal FCA, and contains provisions similar to the ones quoted above. Relator asserts claims under the Florida FCA for the Medicaid false claims alleged in this Complaint.

### The Anti-Kickback Statute

32.     The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, makes it a criminal offense to "knowingly and willfully" offer, pay, solicit or receive any remuneration to induce referrals of items or services paid for by Government health care programs. Specifically, the AKS provides:

(1)   whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A)   in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . .

(B)   in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program;

(2)   whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person;

(A)   to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . .

(B)   to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or

9

item for which payment may be made in whole or in part under a Federal health care program . . . . 42 U.S. C. § 1320a-7b(b).

33.    Specific intent is not required to establish a violation of the AKS. 42 U.S.C. § 1320(a)-7b(h).

34.    A "Federal health care program" is defined as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government. The AKS applies to funds received by Defendants from programs including Medicare, Medicaid, TRICARE and the Veterans Administration.

**Violations of the AKS Can Form the Basis of FCA Liability**

35.    Congress has long viewed the elimination of kickbacks as central to any efforts to combat Medicare fraud and abuse. Courts have held that a person or entity that violates the AKS and subsequently submits a claim for payment or causes another to do so has violated the FCA, regardless of what form the claim or statement takes. Courts have reasoned that such claims are false because there is a false certification attached to them—either express or implied—as to compliance with the AKS each time a tainted claim is submitted.

36.    Defendants violated the AKS by offering remuneration and incentives, in various forms, to physicians to induce them to make referrals to Steward facilities for health services payable by Medicare. Medicare does not cover services that are provided because of illegal inducements. All claims for payment for those services are false.

37.     In 2010, under the Patient Protection and Affordable Care Act,

Congress amended the AKS to expressly clarify that a violation of the AKS

constitutes a "false or fraudulent" claim under the FCA.

### The Stark Act

38.     The Stark Act, 42 U.S.C. § 1395nn, states that if a physician or member

of his immediate family has a "financial relationship" with an entity providing

healthcare services:

> (a) the physician may not make a referral to the entity for the furnishing
> of designated health services, and
>
> (b) the entity may not present or cause to be presented a claim under
> this subchapter or bill any individual, third party payor, or other
> entity for designated health services furnished pursuant to a referral
> prohibited under subparagraph (A), 42 U.S.C. § 1395nn(a)(1).

39.     The regulations implementing the Stark Act state that a "financial

relationship" may include "a direct or indirect compensation arrangement . . . with

an entity that furnishes [designated health services]." 42 C.F.R. § 411.354(a)(1)(ii). A

"compensation arrangement" can be "any arrangement involving remuneration,

direct or indirect, between a physician . . . and an entity." *Id.* at § 411.354(c).

### Violations of Stark Can Form the Basis of FCA Liability

40.     Compliance with Stark is a precondition for payment from Medicare.

41.     Each claim submitted to Medicare for reimbursement of health services

provided to beneficiaries is accompanied by an express or implied certification that

11

the transaction is not in violation of federal or state statutes, regulations or program rules. Falsely certifying compliance with Stark or AKS in connection with a claim submitted to a federally-funded health care program is actionable under the FCA.

## ALLEGATIONS

42.     Steward set the stage for expansion of its nine hospital chain in September 2016 when it sold the real estate assets of its nine Massachusetts hospitals to Medical Properties Trust (MPT). The sale/leaseback deal included a $1.2 billion investment in the real estate, a $50 million equity stake in Steward and $100 million in capital improvements for the hospitals. The MPT investment fueled the expansion.

43.     After the investment, Steward made its first acquisition outside Massachusetts when it bought eight hospitals from the struggling Community Health Systems (CHS), then the largest for-profit hospital chain in the country. The 2017 deal nearly doubled Steward's size and counted three Space Coast Florida hospitals with a total of 571 beds.

44.     Two of the hospitals – Melbourne Regional Medical Center and Sebastian River Medical Center – still were losing money in 2020. The third, Rockledge Regional Medical Center, posted an operating profit of 6.4 percent.

45.     In March 2017, just a month after Steward finalized the deal with CHS, the CEO of a small publicly-traded Melbourne, Florida company brought the hospital chain a proposal to increase use and revenue of their newly acquired facilities in central Florida. It hoped to implement its plan nationwide.

46.    A month later, in late April 2017, Ralph de la Torre, the Steward chief executive officer and one of its largest stockholders, invited Christian "Chris" Romandetti and First Choice's chief financial officer to dinner to "explore and discuss Steward and FCMG [First Choice Medical Group] partnerships."

47.    First Choice operated what it called "medical centers of excellence" that concentrate on treating patients who need orthopedics, interventional pain management, physical therapy and other ancillary and diagnostic services.  Unlike many other healthcare groups, its operations are not physician-owned. It employs its doctors.

48.    CEO Romandetti proposed that First Choice hire a neurosurgeon who would exclusively perform surgeries at Steward, providing the hospital chain guaranteed the doctor's salary. The hiring proposal was just one part of a plan to direct business to Steward.  An agenda created for internal use outlined the plan:

> "What would a strategic partnership between FCHS and Steward look like? What would the net benefit for both parties possibly look like?"

> "We would bring as much business as insurance would allow us to bring to the Steward hospital systems that FCHS has. ... Trying to move as many unnecessary [in-patient] hospital surgeries to our outpatient surgery center."

49.    Steward would need to add capacity to its central Florida hospitals to accommodate the additional surgeries, claimed a PowerPoint presentation titled, Steward and First Choice Healthcare Solutions, A Partnership to Drive Growth in Brevard County.

50.     First Choice also intended to expand nationally. As part of any deal, it would focus on organizing clusters of orthopedic surgeons around other Steward hospitals across the country to drive services to the multi-billion-dollar hospital chain. An agenda prepared by First Choice for a meeting with Steward executives stated:

> "Expanding our services to other Steward communities (36 opportunities) organizing clusters of orthopedic surgeons around other Steward hospitals, implementing ancillary services in the same communities. FCHS has intended to open up other orthopedic platforms across the country FCHS would realign its opportunities and focusing on opening nonphysician owned orthopedic platforms in communities where Steward exist."

51.     By May 2017, Tim Crowley, then a senior vice president of physician network development at Steward, told Romandetti in an email, "I told the boys back home about our meeting the other night and raised some of the issues we discussed. All were positively disposed towards the concepts we discussed."

52.     Crowley provided several "categories" that he suggested Romandetti and First Choice vice president Kris Jones summarize for Steward executives, including operating room issues that negatively impact their doctors and patient flow, clinical concerns at the hospitals, needed structural changes, adding new physicians to the network and various financial options.

53.     The agenda was to increase revenue by the "realignment" of surgery between the hospitals and an ambulatory surgery center while both companies work on bundled payment initiatives.

54.     After months of telephone conferences, in-person meetings and projections, in October 2017, Steward requested, and First Choice supplied an estimate of the number of inpatient and ambulatory care center surgeries it expected to perform in 2018. First Choice sent the estimate to Crowley and Josh Putter, the president of Steward's central division.

55.     Steward's Crowley wanted more detail.

56.     After receiving a First Choice spreadsheet summarizing the overall increase in surgeries. Crowley wrote in an October 12, 2017 email to CEO Romandetti:

> "Would all of these inpatient cases need to be done at Melbourne or could they be spread to all three hospitals? Maybe based on where the patients came from? If so, what might the spread be?"

57.     Eight hours later, he added in a separate email questions from Joe Ciccolo, the CFO of the Central Division who was putting together a presentation for Steward CEO Ralph de la Torre:

> "Roughly, how much of each of these cases is incremental, do you estimate? (Joe is the CFO of the Central Division and he is putting together the deck for Ralph.) Also, the other question is how much of these cases could we spread to the three hospitals?"

58.     When Romandetti told Crowley it would be difficult to determine, Crowley told Aaron "Ron" Gicca to figure it out. The next morning, Gicca provided a detailed spreadsheet estimating the 1,225 incremental surgeries would flow to the three Steward hospitals.

15

59. The revised spreadsheet estimated Dr. Lombardo would add 204 surgeries, Dr. Sands would add 300; Dr. Hynes would add 219; Dr. Billys would add 110; Dr. Hardy-St. Pierre would add 100; and, Dr. Datta would add 67.

60. First Choice also provided a breakdown of its payor mix. It showed Medicare made up 32.72% of its orthopedics patients with Tricare adding 7.34%. Government insurance paid for 42.04% for Medicare spine patients and 5.26% with Tricare adding another 5.26%.

61. Crowley described the deal with First Choice as the "biggest no brainer in the history of man. And if they can't see this, I need to find a new company to work for."

62. The discussions of payor mix and incremental surgeries directed to Steward hospitals came after the companies exchanged an outline of warranties by both parties. Among them: "FCHS [First Choice Healthcare Solutions] will realign surgery loads between hospitals and ASC to net best practice for both parties."

63. The outline was accompanied by two PowerPoint presentations. One titled, "Steward Health Care System & First Choice Healthcare Solutions, A Partnership To Drive Growth in Brevard County," said:

**"Recruitment & Retention**
- Employ Neurosurgeon to provide call coverage at Steward's Rockledge, Melbourne and Sebastian facilities
- Employ additional orthopedic surgeons within First Choice Medical Group division
  - Increased Ortho call coverage at Steward facilities
  - Increased surgeries at Steward facilities …
**Integration**

■ FCMG to work with Steward to align and integrate all medical services, as agreed."

64.    Both PowerPoint presentations and the terms sheet were reviewed with Crowley and Putter in an October 2, 2017 meeting with CEO Romandetti and First Choice vice president Kris Jones.  Jones provided electronic copies the next day as Steward put together a presentation for executive vice president Michael Callum.

65.    One presentation, prepared in August 2017, included a slide with a heading titled, "Increase Revenue," which said, in part, "Surgery realignment between hospitals and ASC." The same slide discussed increasing reimbursement contracts to the First Choice Medical Group and reducing malpractice and other expenses.

66.    Crowley responded, "This will be awesome."

67.    Negotiations to realign surgeries were conducted with a group of high-ranking Steward executives including: Callum, the second largest stockholder behind de la Torre;  Putter, the president of Steward's central division; Daniel Knell, a Steward regional president; and, Tom Bowden, the chief operations officer of the central division.

68.    As the deal came closer to completion, Crowley told Romandetti the "investment" was being made in exchange for surgeries, but that understanding could never be put in writing. The "incremental" benefits were only discussed in breakout sessions involving Crowley, Callum and Putter from Steward and Romandetti, Jones and CFO Philip Keller from First Choice.

69.    As relayed to the principal of Relator, after conversations with lawyers, executives from First Choice and Steward "understood" certain elements of the deal should not be put in writing over concerns they would raise questions about violations of Stark and AKS laws on the "stock purchase" deal. These elements included equipment purchases, the realignment of surgeries and similar details which could be viewed as allowing Steward to manage or direct First Choice or would show an exclusive arrangement between the two companies.

70.    As the two companies negotiated, Crowley provided an internal Steward presentation outlining its strategy to expand in Indian River County. The package included a master list of doctors, their affiliates and specialties -- a list generated for First Choice to recruit, in part, to target the unmet needs at Steward's Florida hospitals.

71.    In February 2018, the two companies announced their "strategic partnership." Steward finalized the arrangement by purchasing 5,000,000 shares of First Choice -- 15.5% of the company – for $7.5 million. The agreement prohibited the money from being used to retire debt, redeem stock or settle outstanding litigation.

72.    At $1.50 a share, Steward overpaid by between 20 percent, based on a history of First Choice stock sales, and 50 percent.

73.    In 2017, for example, its stock price fluctuated from 97 cents to $1.73 a share. From the time negotiations began in June 2017 until the purchase was

announced in February 2018, the stock price met or exceeded the $1.50 a share paid by Steward just twice – both occurred in June.  It never reached $1.50 again.

74.     On average, investors during that time paid $1.25 a share – 20 percent less than Steward.

75.     The average share price may not adequately reflect the stock's value. First Choice is a low-volume stock sold over-the-counter. The company warned potential investors its stock may not be actively traded and the bid and ask prices for its shares may fluctuate widely.

76.     Its stock traded at about $1 per share during much of the negotiation period. The price increased when word of an impending deal with Steward leaked out, artificially increasing the stock price before the deal was finalized.

77.     CFO Philip Keller estimated Steward overpaid by 50 percent. Steward never conducted a fair market value analysis of First Choice's worth.

78.     On February 20, 2018, two weeks after the deal was announced, senior officials of both companies discussed realigning surgeries and hiring staff to direct expensive and profitable procedures to Steward's central Florida hospitals, according to the agenda for a meeting with Steward Vice President Crowley, Putter and Gicca, the president of Melbourne Regional Hospital.

79.     Over the next months, First Choice and Steward executives met regularly – as often as once a week – to discuss hiring doctors who could provide services to Steward, transferring business to First Choice, the increase or decrease of surgeries to the healthcare giant's Space Coast facilities and the impact on revenue.

80.    These meetings featured a "punch list" of action items to be completed and the executive assigned to handle the task.  Reports tallied the number of surgeries directed to each hospital, which physicians performed them and the gross revenue. The totals compared performance to the previous month and the previous year.

81.    Participants included the chief executive officer, the chief financial officer and a financial analyst from First Choice as well as the president of Melbourne Regional Hospital, the president and chief operating officer of Steward's central division and the executive vice president.

82.    First Choice, a publicly traded company, did not hold similar discussions with Health First – the largest healthcare system in the area – even though it accounted for more than 20 percent of its business or with other investors. As one First Choice executive put it: Health First did not own a 15 percent stake in the company.

83.    First Choice CEO Romandetti summed up the effort this way in an April 27, 2018 email to Putter, the president of Steward's central division, discussing the number of cases provided to the healthcare giant's local hospitals:

> "Additional information we are requesting would be what is the year-over-year numbers This [year-over-year] will shed light on how long ago we started moving cases over to you. ... The next thing I we will then look at is witch (sic) doctors have the most opportunity to move their current book of business to your locations.
>
> "Once we determine this I think it would be very important to have in person meetings with our physicians and your staff to address and overcome any questions or concerns they might have."

84.     Romandetti acknowledged increases in surgeries, so-called "incremental" procedures, were the most important to Steward, but questioned whether more surgical procedures alone was what was needed.

85.     "Surgical profitability by surgeon/surgery type Josh do you really just want more surgeries? Or do we want to both be smart enough to figure out what type surgeries we would rather have and which ones are not nearly as important. All this information is in your database.

> "Please advise on how we go about obtaining this so we just don't go after hiring doctors to give us a lot of nonprofitable surgeries."

86.     Romandetti's simple question led to an effort by Steward and First Choice to direct the most profitable surgeries to the healthcare giant's Space Coast hospitals.

87.     The effort increased revenue by 43 percent even though the number of cases from First Choice doctors rose by just 5 percent at Melbourne and Sebastian Regional Medical Centers, according to a spreadsheet prepared by CFO Keller in preparation for a meeting with Steward executive vice president Michael Callum.

88.     Keller used average case values provided by Melbourne Regional President Gicca to calculate the $5.4 million increase in revenue – roughly 70 percent of the $7.5 million "investment" made by Steward just six months earlier.

89.     In weekly meetings, email messages and conference calls, Steward's local and corporate executives tracked surgeries, discussed hiring doctors to direct

incremental business to the hospitals and prevent "leakage" – referring patients outside Steward and its affiliates.

90.     First Choice hiring decisions were considered in conjunction with Steward. Executives discussed salaries, whether the physician would be exclusive to Steward, whether Steward should buy out a non-compete clause for a doctor being hired by First Choice and the impact on the hospitals.

91.     For example, as First Choice made an offer to Dr. Brennan in late April or early May 2018 for the surgeon to practice at the Steward facility in Rockledge, Romandetti warned Putter "the only way this becomes a net positive deal for you is if we back fill his surgeries for Melbourne."

92.     Steward vice president Crowley intervened on First Choice's behalf with the Steward Medical Group When local hospital executives expressed concern about hiring staff, Crowley wrote in an email that included Putter and Knell:

> "You mentioned that you were concerned about adding too many PCPs (primary care physicians) to SMG (Steward Medical Group) too quickly.
>
> "We have a need ... for physician to do pre-operative clearances for orthopedic surgeries with our new partners at First Choice Healthcare Solutions. The patients would be sent to SMG offices for the clearances so it would be added volume and revenue and help us with throughput for Ortho cases."

93.     After the email, the mid-level executives concluded they had no hesitation to hire doctors and "the ortho volume will most certainly help!!" Andy Romine, the president of Rockledge Regional Medical Center, offered to show First Choice an old surgery center it owned with two operating suites.

94.    At Crowley's request, a Steward consultant calculated the number of inpatient and outpatient orthopedic and spine patients in Brevard and Indian River counties. Kelly Enriquez, then the president of the 154-bed Sebastian River Medical Center, provided a "leakage" report showing where its physicians were referring patients.

95.    Enriquez was instructed to tell First Choice what types of cases were "missing so FC could hire the right ortho." When a neurosurgeon left, Crowley asked how many surgeries needed to be covered by First Choice doctor Jacob Januszewski. Meantime, Putter scheduled a discussion with Enriquez on the use of three existing orthopedic doctors working with the Steward system.

96.    Gicca promised to privately provide two officials at First Choice with an updated count of surgical runs broken down by First Choice doctor at Melbourne Regional each week, adding in an March 2018 email that he provided the information, "since I know there is a lot of focus."

97.    His analysis showed that if volumes held for March, the number of surgeries directed to Melbourne Regional would have fallen by 16, though "charges are still up" due to the increase in more profitable spinal surgeries. Gicca stressed final charges had yet to be determined.

98.    By the end of April, Romandetti, the CEO of First Choice, was providing Putter, the president of Steward's Central Division, with detailed information about where surgeries were performed and what could be shifted to the

Steward hospitals. The first breakdown came just four hours after a discussion between Romandetti and Putter.

99.    The initial review concluded 121 surgery cases were eligible to be moved to a Steward facility, though Romandetti warned his analysis would have to be refined. He added: "Normalizing this on a yearly basis if you got every non-Health First case that we get would be 480 cases a year."

100.    Later, a more detailed breakdown charted the number and percentage of surgeries by month, by facility, by doctor and cases linked to insurance plans affiliated with Health First, a $1.7 billion healthcare system with four hospitals and a network of related facilities in the greater Melbourne area. A revised analysis said 93 surgeries could be moved to Steward.

101.    These detailed analyses were prepared in advance of a telephone conference with Romandetti, Putter, the president of the Steward Central Division; Knell, a Steward regional president; and, Crowley, a vice president. A detailed breakdown was sent to Putter and Crowley.

102.    In June 2018, Bowden, the director of operations of the Central Hospital Division, wrote an email thanking First Choice for preparing a "punch list" to ensure "we are completing items of value to the partnership timely."

103.    The punch list items scheduled for discussion with senior Steward executives included: Steward's hiring of a staffer to direct profitable surgeries to the hospital chain; the hiring of new physicians at First Choice; the purchase of new

equipment needed to outfit surgery suites for cranial and neurosurgery; and, the identification of open blocks of time in the surgery suites.

104.   The action items were assigned to executives at Steward and First Choice. Kelly Enriquez, the president of Sebastian River Regional Medical Center, was charged with evaluating the types of cases that "are missing so [First Choice] can hire the right ortho."

105.   Bowden arranged a June 12, 2018 meeting in Boston between First Choice CEO Romandetti and high ranking Steward officials: Michael Callum, the executive vice president; Knell, a regional president and John Polanowicz, the chief operating officer.

106.   Gicca, the president of Melbourne Regional, validated the surgical statistics put together by First Choice and compared surgical volume in 2016 and 2017. Steward prepared a financial analysis showing case trends. Gicca wrote a job description for a new hire who would direct expensive and profitable surgeries to Steward hospitals, a position dubbed the "Control Tower," while Bowden prepared a "profitability analysis."

107.   As part of its "investment," Steward was to move its physical and occupational therapy and orthopedic business from its hospitals in Melbourne, Sebastian and Rockledge to First Choice. The "punch list" circulated at executive meetings assigned the task to Putter, the president of Steward's central division, in early February 2018. The transfer of physical, occupational and speech therapy cases started slowly.

108.    When First Choice complained during a meeting with executives that it received only 19 of 540 outpatient physical, occupational and speech referrals from Steward, the action item read: "Steward to investigate … working with Ron on how to tighten process. Ron to set goals on the numbers."

109.    Steward corporate officials also became involved. In an October 15, 2018 email, Tom Bowden, the chief operating officer of the company's central division, told Romandetti and CFO Keller the company was continuing its efforts to have Steward Medical Group (SMG) make therapy referrals to First Choice. He wrote:

> "Daniel [Knell] has been involved at the ELT level managing the conversation. Ron has also been meeting with in market SMG leadership and we are starting to see progress. We will continue to review volumes to ensure referrals begin increasing steadily."

110.    At one point, Steward also considered moving management of the therapy programs to First Choice. Bowden's email included a surgical case count of First Choice employed physicians and the status of a deal to hire a surgeon's wife as a coordinator at the hospital spine center.

111.    By directing therapy, orthopedic or other services to First Choice, Steward – one of the company's largest stockholders -- increased the company's value and its own investment.

112.    The "strategic partnership" frayed in late summer 2018.

113.    In September 2018, two senior Steward executives, a former managing director of the private equity company that owned the healthcare company and two

top officers of First Choice met for dinner at the Eau Gallie Yacht Club at Indian Harbor Beach.

114.  Michael Callum the Steward executive vice president, sat just to the right of Romandetti, flanked by Jim Renna, a former official at the Cerebrus private equity firm and First Choice board member; and Daniel Knell. First Choice CFO Keller sat between Knell and Romandetti.

115.  The dinner discussion focused on what one participant recalled as actions that could be taken to benefit the partnership, code for increasing patient referrals. Referrals were not specifically mentioned, he recalled, because everyone at the table knew that would constitute a Stark Law violation, which prohibits remuneration based on the value or volume of referrals.

116.  A second participant provided a more detailed description: At some point, Callum excused himself from the table and Renna bluntly explained Steward was not getting the referrals it paid for with its $7.5 million investment.

117.  However it was delivered, the message was clear: Steward was not getting its money's worth. First Choice needed to increase the number of referrals.

118.  As it was relayed to the principal of Omni, Romandetti recalls being told Steward would hire its own doctors and siphon business from First Choice to push it out of business. First Choice scrambled to salvage the business relationship. Romandetti pledged to increase the number of referrals.

119.  The dinner meeting came about a week before a financial reconciliation prepared by CFO Keller based on financial records provided by the president of

Melbourne hospital concluded surgical revenue at the two of the hospitals increased by $3.5 million – almost half of the $7.5 million Steward invested -- in less than eight months. Revenue to Steward exceeded the amount First Choice received.

120.    The surgery count increased by 52 cases at Melbourne and Sebastian River regional hospitals when comparing the number of procedures in 2017 and 2018.  His summary concluded revenue increased from $12.4 million to $15.9 million based on weighted averages.

121.    To ensure First Choice met its goals, Romandetti asked that Gicca, the president of Melbourne Regional, or the control person – a position filled to direct First Choice surgeries to Steward – to work with staff "to make sure we have enough surgery days over the next three months to achieve our goal that we represented we would."

122.    A series of email detailed every change, no matter how minor. One patient had second thoughts and postponed. Another could not undergo surgery because he had not stopped taking a blood thinner in time. Staff plugged holes in surgery schedules by convincing patients to move up procedures and shifting "small" cases that could have been handled outside the hospital to Steward.

123.    Gicca, the president of Melbourne Regional, cross-checked procedures listed on a surgery tracker spreadsheet to determine whether additional cases had been added. His initial review found an additional nine cases. Then, he suggested the First Choice "ortho guys" schedule additional surgeries on days each month when his hospital operating rooms are either empty or lightly used adding, "Given their

28

current output FC ortho guys could fill those for another 8-10 incremental to your run rate. Just an extra boost if you're getting flak."

124.   One practice administrator and patient advocate responded in an October 24, 2018 email: "Tomorrow I will be reviewing [Dr.] Lombardo's 10/26/18 cases and [Dr.] Harrison's 10/29/18 cases [both at an outpatient surgery center] to see what we can filter over. All schedulers are aware that anything we can divert, needs to happen ASAP."

125.   On October 25, 2018, Keller told Romandetti that First Choice was eight surgeries short of its goal. The company's schedulers scrambled to redirect surgeries to Steward.

126.   A scheduler said, "I have picked up 10/31/18 for Lombardo @MRMC [Melbourne Regional Medical Center] – I just need cases."

127.   A week later, Romandetti announced in an email to Callum, Knell and James Renna, a First Choice board member and lead financial executive at Cerberus – the three Steward representatives at the yacht club dinner – that First Choice hit its goal.

> "In September we did 126 cases at Steward facilities, we had committed to adding 15, I'm excited to report that with the team effort working closely among all surgery schedulers both with the [The Back Center] and [First Choice Medical Group] and Steward we completed 165 cases at Steward facilities an increase of 39 cases for the month."

128.   In November 2018, Dr. James Billys instructed his staff to move his cases to Melbourne Regional. His decision came shortly after Steward agreed to hire his wife, Melissa.

129.    Kim Bean, the operations manager at the First Choice Medical Center/BACK Center, wrote Billys to verify his telephone order to move the surgeries. She wrote:

> "Just to double check on our phone conversation we had on Tuesday Oct. 30[th]. My understanding is that Melissa will be working at MRMC starting Jan. 1[st] with the spine program. Even though she doesn't start until January 1[st], you are wanting to move all HRMC [Holmes Regional Medical Center] cases to MRMC effective November (second week). Understanding that certain cases will have to HRMC because of insurance."

> "You also wanted two days there a week and I will be working with Brooke/Michelle to get you two days. I just wanted to verify everything before proceeding to get surgery block times."

130.    As First Choice struggled to re-direct its surgeries, Steward began recruiting doctors from its strategic partner. In early October 2018, Steward hired a doctor recruited by First Choice as the Brevard company was negotiating a contract.

131.    Steward's recruiting efforts accelerated after Romandetti was charged criminally in a pump-and-dump stock scheme that a federal grand jury said was designed to defraud investors and potential investors in First Choice by artificially controlling the price and volume of traded shares.

132.    A day later, on November 15, 2018, the federal Securities and Exchange Commission (SEC) alleged in a separate lawsuit that Romandetti and three co-conspirators manipulated the market price and trading volume of First Choice. The scheme, which began in September 2013 and lasted until approximately June 2016, caused at least $2.5 million in losses to more than 100 unsuspecting retail

investors while generating $3.3 million in profits to the defendants, the SEC alleged. The share price of First Choice plummeted.

133. Steward recruited orthopedic surgeons from First Choice with offers to increase their compensation, on information and belief, by at least $100,000 a year. From January through August 2018, doctors Richard Harrison, Ken Sands, Tony Lombardo together accounted 1,000 surgeries -- more than half of the procedures performed through First Choice. All now work at Steward and, upon information and belief, are paid more than fair market value.

134. At about the same time, it tried to acquire the other major operation controlled by First Choice, Brevard Orthopaedic Spine & Pain Clinic, which does business as the B.A.C.K. Center. The four doctors at the orthopedic practice, which was controlled by a First Choice affiliate, generated more than 900 surgeries from January through August 2018.

135. On February 25, 2020, Steward alleged in a lawsuit that it paid a grossly inflated price for its common stock interest in First Choice as a result of the "pump and dump scheme" on which Romandetti was indicted.

136. In the wake of the indictment, Steward claims it learned that First Choice engaged in several other fraudulent activities that further inflated revenue shown in the company's financial statements and violated the terms of the stock purchase agreement (SPA). First Choice further violated the SPA conditions by not properly filing financial and other statements with the SEC. Steward is seeking rescission of the stock purchase agreement and damages.

137.    First Choice filed for Chapter 11 bankruptcy protection on June 15 in the Middle District of Florida.

138.    As First Choice's fortunes flagged, Steward began hiring away doctors from other practices, all of whom were receiving compensation in the 90th percentile when compared to their peers with, on information and belief, promises of additional compensation and bonuses. These physicians included Drs. Lombardo, DeLorenzi, Sands, and Harrison. Steward continued to expand its physician network by poaching doctors from these other practices, facilities and competitors as well, to include Drs. Robert Brennan, Patricia Alexander, Ethan Webb and Rhu Jade Raguindin, all of whom were paid compensation in excess of fair market value and/or were given signing bonuses to join the Steward Medical Group.

139.    In September 2020, Steward representatives offered, and subsequently paid, a physician with Suntree Internal Medicine lump sum payments of $250,000 to sign a contract with the Steward Healthcare Network. The contract required that physicians in the practice refer patients to the Steward Healthcare Network.

140.    The physician indicated in a series of messages that Steward visited his office daily and wanted his patient list. The representatives were Felicia Rabsatt-Harris, the executive director of operations at Steward Health Care Network, and John Donlan, the national chief operating officer of the Steward Health Care Network. Daniel Knell was personally on calls to discuss the transaction.

141.    The physician executed the Steward contract before terminating his arrangement with the Space Coast Independent Practice Association.  According to

32

the physician, Steward promised to indemnify him for damages and legal ramifications for his actions.

## COUNT I

### Violations of the Federal False Claims Act for Unlawful Kickbacks and Violations of the Stark Act

142.   Relator incorporates paragraphs 1 through 140 of this Complaint as though fully set forth herein. This count sets forth claims for treble damages and civil penalties under the FCA.

143.   As described in greater detail above, Defendants defrauded Government health care programs by conspiring to submit and/or causing the submission of false and/or fraudulent claims Defendants knew were tainted by violations of the Anti-Kickback and Stark statutes.

144.      Under the FCA, Defendants have violated:

    i.   31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

    ii.   31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and

    iii.   31 U.S.C. § 3729(a)(1)(C) by conspiring to commit a violation of subsections (A) and/or (B).

145.   Because of the false claims made by Defendants, the United States has suffered and continues to suffer damages, and is therefore entitled to a recovery as

provided by the FCA of an amount to be determined at trial, plus a civil penalty for each violation.

## COUNT II

## Violations of the Florida False Claims Act for Unlawful Kickbacks and Violations of the Stark Act

146.    Relator incorporates paragraphs 1 through 140 of this Complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*

147.    As described in greater detail above, Defendants defrauded Government health care programs, including the Florida Medicaid program, by conspiring to submit and/or causing the submission of false and/or fraudulent claims Defendants knew were tainted by violations of the Anti-Kickback and Stark statutes.

148.    Under the Florida FCA, Defendants have violated:

i.    Fla. Stat. § 68.082(2)(a) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;

ii.    Fla Stat. § 68.082(2)(b) by knowingly making, using, or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency; and

iii.    Fla. Stat. § 68.082(2)(c) by conspiring to commit a violation of subsections (a) and/or (b).

34

149.    Because of the false claims made by Defendants, the State of Florida has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the Florida FCA of an amount to be determined at trial, plus a civil penalty for each violation.

<strong>PRAYER</strong>

WHEREFORE, Relator, on behalf of the United States and the State of Florida, respectfully requests that:

a.   This Court enter an order determining that Defendants violated the FCA and the Florida FCA by making false statements and records to cause false claims to be submitted to the United States and the State of Florida;

b.   This Court enter an order requiring Defendants to pay treble damages and the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States and each false or fraudulent claim presented to the State of Florida;

c.   This Court enter an order requiring Defendants to pay all expenses and attorney's fees and costs associated with this action;

d.   This Court enter an order paying Relator the maximum statutory award for its contributions to the prosecution of this action; and

e.   Any and all other relief as this Court determines to be reasonable and just.

**PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS.**

Dated: April 15, 2021.

Respectfully submitted,

*/s/ Jessica Glitz*
Jessica Glitz
Texas Bar No.: 24076095
JGlitz@tbtorts.com
Tautfest Bond, PLLC
5151 Belt Line Road
Suite 1000
Dallas, Texas 75254
Phone: (214) 617-9980
Fax: (214) 853-4281

**Local Counsel for Relator**


Jesse Hoyer Estes
Florida Bar No.: 076934
jesse@hoyerlawgroup.com
Sean Estes
Florida Bar No.: 048320
sean@hoyerlawgroup.com
Hoyer Law Group, PLLC
2801 W. Busch Blvd.
Suite 200
Tampa, Florida 33618
Tel.: 813-375-3700
Fax: 813-375-3710

**Lead Counsel for Relator**

JS 44  (Rev. 06/17)

# CIVIL COVER SHEET

## ORIGINAL

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS
Omni Healthcare, Inc

**DEFENDANTS**
Steward Health Care System LLC. et al.

**RECEIVED**
**APR 1 5 2021**
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**(b)**  County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*
Jessica Glitz Esq., Tautfest Bond, PLLC, 5151 Belt Line Rd. Ste. 1000,
Dallas, Texas 75254 (214) 617-9980

Attorneys *(If Known)*

**3-21CV0870-S**

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☒ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**TORTS**

*PERSONAL INJURY*
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

*PERSONAL INJURY*
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☒ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

*Habeas Corpus:*
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

*Other:*
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. 3729
Brief description of cause:
False Claims Act

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
50,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes  ☐ No

### VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
04/15/2021

SIGNATURE OF ATTORNEY OF RECORD
s/ Jessica Glitz

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 06/17)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; NOTE: **federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.