UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF FLORIDA *ex rel.* OMNI HEALTHCARE, INC. | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 3:21-cv-00870-S |
| v. | ) ) | |
| STEWARD HEALTHCARE SYSTEM LLC; STEWARD HEALTH CARE HOLDINGS LLC; STEWARD HEALTH CARE INVESTORS, LLC; STEWARD PHYSICIAN CONCTRACTING, INC.; STEWARD MELBOURNE, INC. d/b/a MELBOURNE REGIONAL MEDICAL CENTER; STEWARD ROCKLEDGE HOSPITAL, INC. d/b/a ROCKLEDGE REGIONAL MEDICAL CENTER; STEWARD SEBASTIAN RIVER MEDICAL CENTER, INC. D/B/A SEBASTIAN RIVER MEDICAL CENTER RALPH DE LA TORRE; MICHAEL CALLUM; DANIEL KNELL; JOSH PUTTER; TIM CROWLEY and JAMES RENNA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## *QUI TAM* COMPLAINT

Relator Omni Healthcare, Inc. ("Omni" or "Relator"), on behalf of itself, the United States

of America and the State of Florida, alleges and claims against Steward Healthcare System LLC,

Steward Health Care Holdings LLC, Steward Health Care Investors, LLC, Steward Physician

Contracting, Inc., Steward Melbourne, Inc. d/b/a Melbourne Regional Medical Center, Steward

Rockledge Hospital, Inc. d/b/a Rockledge Regional Medical Center; Steward Sebastian River

Medical Center, Inc. d/b/a Sebastian River Medical Center; Ralph De La Torre, Michael Callum, Daniel Knell, Josh Putter, Tim Crowley and James Renna ("Defendants") as follows:

## INTRODUCTION

1.       This is an action to recover damages and civil penalties on behalf of the United States and the State of Florida arising from false and/or fraudulent statements, records and claims made by Defendants. The allegations involve the manipulation of physician compensation to reward doctors for the value and volume of their referrals, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* ("FFCA"), the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), and the 42 U.S.C. § 1395nn ("Stark Law").

2.       Steward Health Care System LLC ("Steward"), the country's largest for-profit hospital chain, publicly promoted its "strategic partnership" with First Choice Health Care Solutions, Inc. ("First Choice"), a small company located in Brevard County, Florida, as part of a plan to reduce healthcare costs throughout its sprawling nationwide network. In private, executives at Steward characterized the purchase of a 15% stake in First Choice in starkly different terms: a no-brainer investment to drive an estimated $150 million in business to Steward Melbourne, Inc. d/b/a Melbourne Regional Medical Center ("Steward Melbourne"), Steward Rockledge Hospital, Inc. d/b/a Rockledge Regional Medical Center ("Steward Rockledge"), and Steward Sebastian River Medical Center, Inc. d/b/a Sebastian River Medical Center ("Steward Sebastian River") – its three faltering Central Florida hospitals.

3.       The financial projections led Steward to pay as much as a 50% premium for First Choice's stock, pledge to build four new operations rooms, and promise to transfer millions of dollars of Steward's existing business to First Choice – all in exchange for referrals.

4.      Together, Steward and First Choice executives worked to divert the least profitable operations to competitors, tracked the number of procedures performed and directed by First Choice doctors to Steward hospitals, calculated how many surgeries could be referred, monitored progress on a weekly basis, and tallied up the increased value.

5.      As discussed herein, Defendants worked together to engage in the above-mentioned practices that purposefully led to the billing of federal and state health care claims.  Consequently, Defendants have knowingly submitted and caused the submission of false claims to Medicare and Medicaid programs because the kickback-tainted claims violate the AKS and Stark Law, and, as a result, violate the FCA and FFCA.

## PARTIES

6.      The United States and the State of Florida are real parties of interest in this action.

7.      Relator Omni Healthcare, Inc. is a multi-specialty physician group based in Brevard County, Florida. Relator operates in central Florida and specializes in the fields of internal medicine, surgery, pediatrics, family practice and many medical and sub-specialties. The facts alleged within are based on the personal observation of Omni's principal, as well as documents and information in his possession. The information and observations led Relator to question Defendants' fraudulent actions. Relator is an original source as defined in 1 U.S.C. § 3730(e)(4)(B), and made voluntary disclosures to the United States prior to the filing of this lawsuit.

8.      Defendant Steward Health Care System, LLC ("Steward") is a Delaware limited liability corporation. It invested $7.5 million when it purchased 15% of Defendant First Choice Health Care Solutions, Inc.'s ("First Choice") stock on February 6, 2018. At the time of the stock purchase, Steward was headquartered in Boston. Steward was an affiliate of Cerberus Capital Management, L.P. until June 2020, when a group of physicians led by Dr. Ralph de la Torre bought

control. Steward operates in nine states. The sole member of Steward is Defendant Steward Health Care Holdings, LLC.

9.     Defendant Steward Health Care Holdings, LLC ("Steward Holdings") is a Delaware limited liability corporation. It holds all of Defendant Steward's outstanding common membership interests. Each membership interest represents the holder's interest in net profits, losses, and distributions by the healthcare system.

10.     Defendant Steward Health Care Investors, LLC ("Steward Investors") is a Delaware limited liability company which holds all of the membership interests in Steward Holdings.

11.     Defendant Steward Physician Contracting, Inc. ("Steward Contracting") is a taxable, non-profit Massachusetts corporation and is a subsidiary of Steward Medical Group, Inc. Under the terms of the stock purchase agreement, Steward designated Steward Contracting to receive the 5 million shares purchased from First Choice. Steward is the direct parent corporation of Steward Medical Group and the indirect parent corporation of Steward Physician.

12.     Defendant Steward Melbourne Hospital, Inc. d/b/a Melbourne Regional Medical Center ("Melbourne Regional") is a Delaware corporation formed on February 9, 2017. Formerly named the Wuesthoff Health System-Melbourne, Melbourne Regional is a 119-bed hospital located in Melbourne, Florida.

13.     Defendant Steward Rockledge Hospital, Inc. d/b/a Rockledge Regional Medical Center ("Rockledge Regional") is a Delaware corporation formed on February 15, 2017. Formerly named the Wuesthoff Health System-Melbourne, Rockledge Regional is a 298-bed hospital located in Rockledge, Florida.

14.     Defendant Steward Sebastian River Medical Center, Inc. d/b/a Sebastian River

Medical Center ("Sebastian River Medical") is a Delaware corporation formed on February 15, 2017. Sebastian River Medica is a 154-bed facility located in Sebastian, Florida.

15.     Defendant Ralph de la Torre is the founder, chairman, and Chief Executive Officer of Steward Health Care System. He has served as chairman and CEO since 2010.

16.     Defendant Michael Callum is the President of Steward Medical Group and Executive Vice President for Physician Services.

17.     Defendant Daniel Knell is a regional Vice President for Steward Health Care.

18.     Defendant Josh Putter was the President of the central division of Steward Health Care from March 2017 through August 2018. He is now President of the South Florida region for Steward Health Care.

19.     Defendant Tim Crowley is a Senior Vice President of Physician Network Development at Steward Health Care.

20.     Defendant James Renna has been a board member of First Choice Healthcare Solutions, Inc. since 2018. He was the lead financial executive at Cerberus Capital Management, L.P. from May 2006 through May 2018.

## JURISDICTION AND VENUE

21.     This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"). Defendants submit and cause the submission of false claims in violation of 31 U.S.C. § 3729(a)(1)(A). In doing so, Defendants make or use false records material to these false claims in violation of 31 U.S.C. § 3729(a)(1)(B).

22.     Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367. Jurisdiction is also authorized under 31 § U.S.C. 3732(a).

23.     Venue lies in the Northern District of Texas pursuant to 31 U.S.C. § 3732(a),

because all Defendants qualify to do business in the State of Texas, transact substantial business in the State of Texas, transact substantial business in this judicial district, and can be found to reside in and/or have transacted business in this judicial district.

## APPLICABLE LAW

### A.  The False Claims Act and Florida False Claims Act

24.      The Federal Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.* reflects Congress' objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345 at 1 (1986). The FCA provides, *inter alia*, that any person or entity that commits any of the following violations is liable to the United States for a civil monetary penalty of at least $5,000 and not more than $10,000 plus three times the amount of damages sustained by the Government for each violation:

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim;
> (3) knowingly makes, uses, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government;
> (4) knowingly conceals or knowingly and improperly avoids or decreased an obligation to pay or transmit money or property to the Government; or
> (5) conspires to commit a violation of the False Claims Act.

31 U.S.C. §3729(a)(1).

25.      Under the FCA, (1) the terms "knowing" and "knowingly" (A) mean that a person with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1).

26.      The FCA defines the term "claim" as (A) any request or demand, whether under a

contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2).

27.     The FCA defines the term "obligation" as an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

28.     An overpayment retained by a person after the later of 60 days after the date on which the overpayment is identified or the date any corresponding cost report is due, if applicable, is an "obligation" as defined by the FCA. 42 U.S.C. § 1320a-7k(d).

29.     The Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* is modeled after the Federal FCA and contains similar provisions to those described herein.  Relator asserts claims under the Florida FCA for the Medicaid false claims alleged in this Complaint.

**B.  The Federal Anti-Kick Back Statute**

30.     In response to the unethical and kickback-tainted referrals plaguing the Medicare system following its establishment in 1965, Congress enacted the federal Anti-Kickback Statue (the "AKS") and made it a misdemeanor to provide "bribes and kickbacks" in exchange for referrals of Medicare funded medical services.  *See* Pub. L. No. 92-603, § 242(b), 86 Stat. 1329, 1419 (1972). As unethical and illegal referral patterns morphed and proliferated, Congress

amended the AKS in 1977 to extend its reach beyond strictly "bribes and kickbacks" to "any remuneration" and elevated violations of the AKS from misdemeanor to felony status. *See* Medicare and Medicaid Anti-Fraud and Abuse Amendments of 1977, Pub. L. No. 95-142, 91 Stat. 1175 (1977).

31.     "The [Anti-Kickback] Statute was enacted to "protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care or necessity of services." *U.S. v. Patel*, 778 F.3d 607, 612 (7th Cir. (Ill.), 2015) citing Health Res. & Serv. Admin., Program Assistance Letter 1995-10, *Guidance on the Federal Anti-Kickback Law.*

32.     In 2010, Congress amended the AKS again to specifically provide that "a claim that includes items or services resulting from a violation of [the AKS] constitute a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g). However, courts have long, and consistently, held violation of the AKS gives rise to additional causes of action under the FCA. *See United States ex rel. Capshaw v. White,* Civil Action No. 3:12-CV-4457-N, 2018 U.S. Dist. LEXIS 197495, at *2 (N.D. Tex. Nov. 20, 2018); *See also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997).

33.     In part, the AKS provides as follows: (b) Illegal remunerations –

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind – (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

(A) to refer an individual to a person for the furnishing or arranging of the furnishing of any item or service for which payment may be made in whole or in part under the Federal health care program, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both…42 U.S.C. § 1320a-7b(b).

34.     A person need not have actual knowledge of the AKS or specific intent to commit a violation of this section. 42 U.S.C. § 1320a-7b(h).

35.     Even if remuneration is paid, in part, for services rendered, if one purpose of payment is to induce the referral of items or services which may be paid for by federal health care programs, the arrangement violates the AKS. *See U.S. v. Greber*, 760 F.2d 68, 69 (3rd Cir.), 1985; *See also United States ex rel. Capshaw v. White,* Civil Action No. 3:12-CV-4457-N, 2018 U.S. Dist. LEXIS 197495, at *1 ("As long as *any* part of the transaction was intended to induce referrals, the transaction violates the law." (emphasis in original).

36.     The AKS does provide for specific exceptions, referred to as "safe harbor," that protect narrowly defined arrangements from AKS liability. *See* 42 CFR § 1001.952. The AKS safe harbors protect arrangements, including certain investment interests, lease agreements that meet specific standards, equipment rentals agreements that meet specific standards, "*bona fide* employment relationships"[1] and "personal services and management contracts" – but only when specific enumerated criteria are met. *See* 42 CFR § 1001.95.

---

[1] The AKS definition of "remuneration" does not include any amount paid by an employer to an employee who has a *bona fide* employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid, or other Federal health care programs. 42 C.F.R. §952(i).

37.     Under the "personal services and management contracts," the AKS' definition of "remuneration" does not include any payment made by a principal to an agent as compensation for services of the agent, as long as all of the following seven standards are met:

(1) The agency agreement is set out in writing and signed by the parties;

(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent;

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specified exactly the schedule of the such intervals, their precise length, and the exact chart for such intervals;

(4) The term of the agreement is for not less than one year;

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a matter that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6) The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 CFR § 1001.952(d). For purpose of [the personal services and management contracts safe harbor], an agent of a principal is any person, other than a *bona fide* employee of the principal, who has an agreement to perform services for, or on behalf of, the principal. *Id.* Pursuant to the express terms of the AKS, any and all payments to non-employee physicians that are determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part by Medicare or Medicaid, or other Federal health care programs is illegal. *Id.* Likewise, any and all payments made to non-employee physicians that are not set in advance or that are inconsistent with fair market value are illegal. *Id.*

**C.  Limitation on Certain Physician Referrals ("Stark Law")**

38.      The initial version of the Stark Law, enacted in 1989, barred physician self-referrals for clinical laboratory services under the Medicare program. In 1993 and 1994, Congress amended the Stark Law to expand the prohibition of physician self-referrals to additional "designated health services."

39.      The Stark Law gives rise to additional cause of action under the FCA and prohibits a physician with a "financial relationship" with an entity from making a referral to the entity for furnishing designated health services that may be paid for by the Medicare program. Such referrals are "prohibited referrals." 42 U.S.C. § 1395nn(a)(1)(A). Additionally, the entity may not present or cause to be presented a Medicare claim or bill to any individual, third-party payor, or other entity for designated health services furnished pursuant to a "prohibited referral." 42 U.S.C. § 1395nn(a)(1)(B).

40.      The Stark Law defines "referral" as either (i) "the request by a physician for, or ordering of, or the certifying or recertifying of the need for, any designated health service for which payment may be made under Medicare Part B, including a request for a consultation with another physician and any test or procedure ordered by or to be performed by (or under supervision of) that other physician, but not including any designated health service personally performed or provided by the referring physician. A designated health service is not personally performed or provided by the referring physician if it is performed or provided by any other person, including, but not limited to, the referring physician's employees, independent contractors, or group practice members." 42 C.F.R. § 411.351.

41.      "Designated Health Services" ("DHS") includes inpatient and outpatient hospital services. 42 U.S.C. § 1395nn(h)(6). "In adding hospital services to the list of DHS, the legislative

history reveals that the Congress was concerned about increased admissions to hospitals." 66 Fed. Reg. 865, 941 (Jan. 4, 2001). "Congress specifically chose to include inpatient and outpatient services as DHS under section 1877(h)(6)(K) of the Act. Inpatient and outpatient hospital services include any services that a hospital provides to a hospital patient, whether it provides them itself or provides them by purchasing them for another entity under arrangements; any other policy would encourage hospitals to purchase as many services as possible under arrangements in order to avoid the effects of the physician self-referral provision." *Id.* at 941-942 (Jan. 4, 2001).

42.     A financial relationship of a physician with an entity is (A) an ownership or investment interest in the entity, or (B) a compensation arrangement between the physician and the entity. 42 U.S.C. § 1395nn(a)(2).

43.     The term "compensation arrangement" means any arrangement involving any remuneration between a physician and an entity. 42 U.S.C. § 1395nn(h)(1)(A).

44.     The Stark Law differentiates a "direct compensation arrangement" and an "indirect compensation arrangement" but prohibits referrals in both instances.

45.     A "direct compensation arrangement" exists if remuneration passes between the referring physician and the entity furnishing designated health services without any intervening persons or entities. 42 CFR § 411.354(c)(1).

46.     An "indirect compensation arrangement" exists if (i) between the referring physician and the entity furnishing DHS there exists an unbroken chain of any number of persons or entities that have financial relationship between them; (ii) the referring physician receives aggregate compensation from the person or entity in the chain with which the physician has a direct financial relationship that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the designated health

services; and (iii) the entity furnishing designated health services has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician receives aggregate compensation that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the designated health service. 42 CFR § 411.354(c)(2).

47.     The term "Remuneration" includes remuneration, directly or indirectly, overtly or covertly, in cash or in kind. 42 U.S.C. § 1395nn(h)(1)(B).

48.     Under the Stark Law, "Entity" is defined as: "A physician's sole practice or a practice of multiple physicians or any person, sole proprietorship, public or private agency or trust, corporation, partnership, limited liability company, foundation, nonprofit corporation, or incorporated association that furnishes DHS." 42 CFR §411.351.

49.     Further, "[a] person or entity is considered to be furnishing DHD if it – (i) is the person or entity that has performed services that are billed as DHS; or (ii) is the person or entity that has presented a claim to Medicare for the DHS, including the person or entity to which the right or payment for the DHS has been reassigned in accordance with… §424.80(b)(2)(payment under a contractual arrangement)." *Id.*

50.     The Stark Law is a strict liability statute. Therefore, any financial relationship between a DHS provider and a physician must meet a Stark exception to be legal without regard to the intent of the parties in the financial relationship.

51.     The Stark Law also applies to claims submitted to state Medicaid programs for DHS furnishes on the basis of a prohibited referral.  42 U.S.C. § 1396b(s).

52.     Like the AKS, the Stark Law allows specific exceptions for certain physician financial relationships that meet specific enumerated criteria.

53.     The Stark Law provides for certain exceptions if the physician referring (otherwise prohibited) services is in a "group practice." *See* 42 U.S.C. § 1395nn(b)(1); *See* 42 U.S.C. § 1395nn(b)(2)(B).

54.     The Stark Law provides for an exception related to "in-office ancillary services" "that are furnished personally by the referring physician…in a building in which the referring physician furnishes physician services unrelated to the furnishing of designated health services." 42 U.S.C. § 1395nn(b)(2)(A).

55.     The Stark Law and its accompanying regulations provide an exception to Stark liability for "*bona fide* employment relationships." 42 U.S.C. § 1395nn(e)(2). To qualify for the *bona fide* employment relationship exception, a compensation arrangement must meet each of the following requirements which are nearly identical to the exception under the Anti-Kickback Statute:

> A.  The employment is identifiable services;
> B.  The amount of remuneration under the employment –
>
>> (i) is consistent with fair market value of the services, and
>> (ii) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician,
>
> C.  the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referral were made to the employer, and
> D.  the employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

42 U.S.C. § 1395nn(e)(2); 42 CFR § 411.357(c).

56.     The Stark Law provides another exception for "personal service arrangements."  To qualify for the "personal service arrangement" exception, a compensation arrangement must meet each of the following requirements:

> (i) the arrangement is set out in writing, signed by the parties, and specifies the services covered by the arrangement;

(ii) the arrangement covers all of the services to be provided by the physician (or an immediate family member of such physician) to the entity;

(iii) the aggregate services contracted for do not exceed those that are reasonable and necessary for legitimate business purposes for the arrangement;

(iv) the term of the arrangement is for at least 1 year;

(v) the services to be performed under the arrangement do not involve the counseling or promotion or business arrangement or other activity that violates any State or Federal law; and

(vii) the arrangement meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

42 U.S.C. § 1395nn(e)(3)(A); 42 CFR § 411.354(d)(4). As under the AKS, if the compensation to be paid is determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties, then the arrangement is illegal. *Id.* Likewise, if the arrangement is not set in advance or exceeds fair market value, then the arrangement is illegal. *Id.*

57.      The Stark Law also provides another exception for certain "indirect compensation arrangements." To qualify for this exception the indirect compensation arrangement defined by § 411.354(c)(4), all of the following conditions must be satisfied:

(1)(i) The compensation received by the referring physician is fair market value for services and items actually provided and not determined in any manner that takes into account the volume or value of referrals or business generated by the referring physician for the entity furnishing DHS;

(2) The compensation arrangement is set out in writing, signed by the parties, and specifies that services covered by the arrangement need not be set out in writing, but must be for identifiable services and be commercially reasonable even if no referrals are made to the employer; and

(3) The compensation arrangement does not violate the anti-kickback statute, or any Federal or State law regulation governing billing or claims submission.

42 CFR § 411.357(p); *See also* 42 CFR § 411.354(d)(4). Under the regulations governing the exception for indirect compensation arrangements, it is reiterated just as it is over and over again

in every other area of the Stark Law and AKS, "if compensation is determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician," then the arrangement is illegal. *Id.*

### D.     The Medicare/Medicaid Program

58.     The Medicare Program is established under Title XVII of the Social Security Act, 42 U.S.C. § 1395, *et seq.* and provides coverage of costs of certain healthcare services for eligible citizens.[2] The United States Department of Health and Human Services ("HHS"), specifically the Center for Medicare and Medicaid Services ("CMS"), oversees the administration of Medicare. Medicare is a 100% federally subsidized health insurance system for eligible Americans, including those aged 65 and older, certain disabled people, and certain people with chronic diseases who elect coverage.  42 U.S.C. § 1395c; 42 U.S.C. §§ 1395j, 1395w.

59.     Medicare only provides benefits for medically necessary services rendered by eligible and appropriately licensed providers.  *See* 42 U.S.C. § 1395y(a)(1)(A). To participate in Medicare, a provider must sign and file a Provider Agreement with CMS promising compliance with applicable statutes, regulations, and guidance.  42 U.S.C. § 1395cc; 42 C.F.R. § 412.23(e)(1). Medicare service providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those delineated in the Medicare Manuals. *Heckler v. Cmty. Health Serv. of Crawford Co., Inc.,* 467 U.S. 51, 64–65 (1984).

60.     Reimbursement for Medicare claims is made by the United States through HHS. CMS is directly responsible for the administration of the Medicare program. CMS contracts with

---

[2] At all times stated herein, the term "Government Payor" and "Medicare" also includes other government healthcare programs, including TRICARE/CHAMPUS 10 U.S.C. § 1071 et seq., and Federal Employee Health Benefits Program, 5 U.S.C. § 8901 et seq., since said programs have similar requirements and have been similarly defrauded by Defendants, as alleged herein.

private insurance carriers to administer and pay claims from the Medicare Trust Fund. *See* 42 U.S.C. § 1395u. Claims submitted for reimbursement are to be paid in accordance with the Social Security Act, Code of Federal Regulations, and Medicare Rules and Regulations promulgated by CMS.

61.     The Medicare Program is segmented into four parts. Medicare Part A is the portion of the Medicare program that covers payment for inpatient hospital and other institutional care. *See* 42 U.S.C. §§ 1395c-1395i-4. Medicare Part A and "inpatient" status is implicated when the patient is formally admitted to a hospital with a doctor's note. *See* Medicare Claims Processing Manual. Ch. 1 § 10.2. "The order to admit as an inpatient ("practitioner order") is a critical element in clarifying when an individual is considered an inpatient of a hospital, including a critical access hospital, and is therefore required for all hospital inpatient cases for hospital inpatient coverage and payment under Part A." *Id.* Further, '[t]he decision for inpatient hospital admission is a complex medical decision based on a [a] doctor's judgment and the [patient's] need for medically necessary hospital care. An inpatient admission is generally appropriate for payment under Medicare Part A when [the patient] is expected to need 2 or more midnights of medically necessary hospital care, but [the patient's] doctor must order this admission and the hospital must formally admit [the patient] to become an inpatient."

62.     A physician referring and ordering an inpatient hospital admission is a "gatekeeping physician" tasked with proposing plans of care and certifying the legitimacy of the plans and the necessity of the proposed services. *United States v. Patel*, 17 F.Supp.3d 814, 830 (N.D.Ill 2014). "The potential for increased costs to the Medicare system [which is the primary purpose of the AKS] is particularly acute where a medical service provide that gets paid per service rendered is responsible for proposing plans of care, and the gatekeeping physician tasked with certifying the

legitimacy of the plans and necessity of the proposed services is given remuneration each time he approves or reapproves a plan." *Id.* First Choice and Steward implemented this precise arrangement. Therefore, a physician's determination of medical necessity of inpatient surgery admission is wholly corrupted when the referring "caregiver" has to exclusively refer patients to a specific hospital. Protection from such corruption lies at the foundation of the AKS and Stark Law, which Defendants violated.

63.     Medicare Part B is the portion of the Medicare program that primarily covers outpatient care, including physician services and department services. *See* 42 U.S.C. §1395k.

64.     Medicare defines a "provider" to include "a hospital…that has in effect an agreement to participate in Medicare." 42 C.F.R. §400.202.

65.     Medicare defines "supplier" as "physician or other practitioner, or an entity other than a provider, that furnishes health care services under Medicare." 42 C.F.R. §400.202.

**(i)     Medicare "Provider" (Hospital) Payment Structure and Certifications Required for Payment**

66.     CMS administers many aspects of the Medicare program through contracts with third-party Medicare Administrative Contractors (MAC). 42 U.S.C. § 1395kk-1.

67.     CMS (through MAC) makes payments prospectively for hospital inpatient services, through periodic payments and a cost-reconciliation process.

68.     CMS (through MAC) makes payments retrospectively for hospital outpatient services after the services are rendered.

69.     When a Medicare beneficiary is discharged from an inpatient episode of care, the hospital submits claims for payment for the inpatient items and services the beneficiary received during that inpatient episode of care. 42 C.F.R. §§ 413.1, 412.2. Inpatient services are paid using the Inpatient Prospective Payment System (IPPS) which pays hospitals, on an interim basis, the

reasonable costs of services furnished to beneficiaries.  42 C.F.R. § 413.64.

70.    Designated hospital outpatient items and services, including services rendered to patients in a hospital emergency department such as X-rays, emergency department visits, and partial hospitalization services in hospital outpatient departments, are paid by Medicare using the Outpatient Prospective Payment System (OPPS).

71.    Under the OPPS, predetermined amounts are paid for designated services furnished to Medicare beneficiaries. These services are identified by codes established under the Centers for Medicare & Medicaid Services Common Procedure Coding System (HCPCS). 42 C.F.R. § 419.2.

72.    A hospital submits claims, payable under the OPPS and IPPS, to Medicare using an institutional claim format known as the ASC X12 837, or where permissible, the hardcopy version, Form CMS-1450. The ASC Xl2 837 and Form CMS-1450 are processed and paid by the provider's MAC. See Medicare Claims Processing Manual Ch. 3 § 10.1.

73.    At the end of the fiscal year, CMS requires hospitals to file an annual "cost report" - CMS Form 2552. The hospital cost report is the final claim that a provider submits to a MAC for items and services rendered to Medicare beneficiaries during that fiscal year. Included in the hospital cost report is the hospital's stated amount of Medicare Part A reimbursement that the hospital believes it is due for the year or the amount of excess reimbursement the hospital received from interim payments which the hospital must refund to Medicare. See U.S.C. § 1395(g)(a); 42 C.F.R. §413.24. Therefore, Medicare relies on the material information submitted in the hospital cost report to determine whether the provider is entitled to more reimbursement than it has received through interim payments or whether the provider has been overpaid and must refund Medicare a portion of the interim payments. See 42 C.F.R §§405.1803, 413.60.

74.    When submitting a hospital cost report, a provider must also submit a hard copy of

a "settlement summary," which is a statement of certain worksheet totals found within the cost report's electronic file and a "certification statement" which must be signed by the hospital's administrator or chief financial officer certifying the accuracy of the cost report. See 42 CFR §413.24(f)(4)(iv).

75.    The certification statement, required to be signed by the provider's administrator or chief financial officer and submitted with the cost report, includes the following section:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

42 CFR §413.24(f)(4)(iv); FORM CMS-2552-10.

76.     Further, the "certification statement" also requires the provider's administrator or chief financial officer to certify:

> [T]o the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

FORM CMS-2552-10.

77.    State Medicaid programs must comply with the minimum requirements set forth in the federal Medicaid statute to qualify for federal funding. 42 U.S.C. § 1396a.  In order to receive reimbursement from Medicaid, a provider must submit a signed claims form to the state's Medicaid program, certifying that the information on the form is "true, accurate, and complete." 42 C.F.R. § 455.18.  The provider further certifies that it "understand[s] that payment of this claim

will be from federal and state funds, and that any falsification, or concealment of a material fact, may be prosecuted under federal and state laws." *Id.*

78.     Therefore, a provider must provide the material certification that the services and claims submitted in the cost report were billed in compliance with applicable laws and regulations, including the Stark Law and AKS, and thus the provider is entitled to reimbursement for the claims submitted in the cost report.

79.     States primarily deliver health care services to Medicaid beneficiaries through either (1) fee-for-service systems, in which the state Medicaid programs pay individual providers for each service furnished; or (2) a variety of managed care models, most of which involve paying managed care organizations fixed monthly capitation rates for each enrollee to provide a defined set of Medicaid covered, basic health care services and to coordinate and authorize specialty care furnished by other physicians on a fee-for-service basis.

**(ii)     Medicare "Supplier" (Physician) Payment Structure and Certifications Required for Payment**

80.     When physicians provide patient care services in a hospital setting, the physician or an entity to whom the physician has assigned billing rights (such as ESS) may bill Medicare for their services. The claims submitted seeking reimbursement for the supplier's services are referred to as "professional claims" or "professional fee" or "pro-fee."

81.     Professional claims are paid for by Medicare under the Medicare Physician Fee Schedule (MPFS). The Medicare Fee Schedule for a given service is derived from a calculation which considers: the relative value for physician work, relative value for practice expense, and relative value for malpractice; each adjusted for geographic cost differences. To calculate the payment amount, the product of the above variables is multiplied by a dollar-amount national conversion factor - designed to account for yearly changes in the general cost of provision of

healthcare services. See Medicare Claims Processing Manual Ch. 12 § 20.1.

82.     The charge allowed by Medicare for such physician services is the lower of the actual charge or the fee schedule amount. Medicare then pays 80 percent of the allowed charge after the patient's 20 percent deductible is met. Id.

83.     A physician or an entity to whom the physician has assigned billing rights submits claims for professional services to Medicare using the ASC X12 837 professional claim format, or, where permissible, Form CMS-1500. See Medicare Claims Processing Manual Ch. 3 § 10.1.

> Form CMS-1500 provides a Certification and Notice provision that provides: "[T]his is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact may be prosecuted under applicable Federal or State laws."

Form CMS-1500.

84.     For a physician, or entity billing on behalf of a physician to be able to bill Medicare for professional claims the physician or the entity must complete a Medicare Enrollment Application. This application is Form CMS-8551. Among other disclosures and certifications required, Form CMS-8551 contains a "certification statement and signature" and requires the physician to certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 4A of this application. The Medicare laws, regulations, and program instructions are available through the Medicare Administrative Contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1 1 28B(b) of the Social Security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877 of the Social Security Act)).

Form CMS-8551.

85.     Further, Form CMS-8551 also requires physicians to certify:

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

Form CMS-8551.

86.     In addition to a physician being a "supplier," who may bill Medicare directly, a supplier may be an individual, partnership, corporation, trust or estate. See Medicare Claims Processing Manual Ch. 1 § 30.2.2. Therefore, a MAC, administering Medicare Part B may make payment to an entity enrolled in the Medicare program for services provided by a physician or other person under a contractual arrangement with that entity. Medicare Claims Processing Manual Ch. 1 § 30.2.1. Under such an arrangement, both the entity submitting the claim and receiving payment and the physician or other person under contract are subject to the following program integrity requirements: (1) The entity receiving payment and the person that furnished the service are jointly and severally responsible for any Medicare overpayment to that entity; and (2) the person furnishing the service has unrestricted access to claims submitted by an entity for services provided by that person. Medicare Claims Processing Manual Ch. 1 §§ 30.2.1; 30.2.7.

**(iii)     The Medicaid Program**

87.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal portion of each state's Medicaid payments varies by state and is generally between 50 and 83 percent, depending on the state's per capita income. 42 U.S.C. §1396d(b). The remainder of a state's Medicaid expenditures is paid from state funds. Many states, including Florida, have enacted state laws similar to the FCA to combat fraud against government health care programs.

88.     Florida has also enacted laws which prohibit the provision of remuneration in exchange for the referral of medical goods and services paid for by the Medicaid program.

89.     By participating in Florida's Medicaid program, Steward and its executives are

charged with actual notice and knowledge of the federal and state statutes, regulations, and rules applicable to the Medicaid program, and have consented to compliance with all such statutes, regulations, and rules, including those governing reimbursement. During their strategic partnership, Steward has submitted claims on behalf of its patients for services provided to patients covered by Medicaid programs in Florida. These claims have been sent either (1) to the Florida Medicaid program through its designated Medicaid fiscal agent; or (2) to managed care organizations that have contracted with these states to provide health care to their Medicaid beneficiaries (such as Florida's Medicaid managed care contractors: Aetna, United Healthcare, WellCare of Florida, Humana, Sunshine State Health Plan, and BCBS).

## **DEFENDANTS FRAUDULENT SCHEMES**

### I.    **The Expansion Project's "Realignment" Scheme and Physician Compensations**

90.    In September 2016, Steward sold the real estate assets of its nine Massachusetts hospitals to Medical Properties Trust ("MPT"), setting in motion Steward's plan for expansion of its hospital system. MPT's investment included a $1.2 billion investment in Steward's real estate, a $50 million equity stake in Steward, and $100 million in capital improvements to update Steward's facilities. The MPT investment fueled the expansion.

91.    Steward then made its first acquisition outside of Massachusetts in 2017 when it acquired eight hospitals from the struggling Community Health Systems ("CHS"), the then largest for-profit hospital chain in the country, nearly doubling the number of Steward facilities. Steward now owned three Space Coast Florida hospitals – Steward Melbourne, Steward Rockledge, and Steward Sebastian River, totaling 571 hospital beds.

92.    In March 2017, one month after finalizing the CHS deal, Chris Romandetti ("Romandetti"), the CEO of First Choice, brought Steward a proposal to increase the use and revenue of their newly acquired facilities in Central Florida. First Choice operated medical centers

concentrated on treating patients in need of orthopedics, interventional pain management, physical therapy, and other ancillary and diagnostic services. Unlike many other healthcare groups its operations are not physician-owned and First Choice employs its doctors.

93.     In April 2017, Steward's CEO, Ralph de la Torre ("de La Torre"), invited Romandetti to dinner to "explore and discuss Steward and [First Choice] partnerships." A Non-Disclosure Agreement was executed between Romandetti and Defendants Callum and de la Torre.

94.     An agenda was circulated prior to the meeting outlining the intention behind the "strategic partnership." For First Choice, a "strategic partnership" with Steward "would bring as much business as insurance would allow [First Choice] to bring to the Steward hospital systems" by "[t]rying to move as many unnecessary [in-patient] hospital surgeries to [First Choice] outpatient surgery centers." Romandetti proposed that First Choice hire a neurosurgeon who would exclusively perform surgeries at Steward hospitals, provided that Steward guaranteed the doctor's salary.

95.     Term sheets, presentations, and financial analysis documents were exchanged among First Choice and Steward executives in order to explore the potential benefits of the partnership. Romandetti and Defendants Crowley, Callum, and de la Torre were individually all involved in the discussions. First Choice and Steward wanted to expand their partnership nationally and the Space Coast hospitals provided fertile testing ground for the success of the partnership. The partnership aimed to increase revenue by the "realignment" of surgery between the hospitals and an ambulatory surgery in order for First Choice and Steward to work on bundled payment initiatives.

96.     By May 2017, Crowley, then a senior vice president of physician network development at Steward, emailed Romandetti stating, "I told the boys back home about our

meeting the other night and raised some of the issues we discussed. All were positively disposed towards the concepts we discussed." Crowley then provided Romandetti several "categories" for Romandetti to summarize for Steward executives, including operating room issues that negatively impact their doctors and patient flow, clinical concerns at the hospitals, needed structural changes, adding new physicians to the network, and various financial options. This agenda served to increase revenue by the "realignment" of surgery between the hospitals and an ambulatory surgery center while both companies worked on bundled payment initiatives.

97.    A June 6, 2017 email from Crowley references an upcoming meeting with Callum, Putter, and Mark Girard, the executive overseeing the Steward Healthcare Network. The email chain discusses the potential partnership with First Choice, with Putter indicating a desire to generate hospital revenue, Girard indicating his focus on growing the network and covered lives, and a discussion as to how the opportunity might be presented to de la Torre, who implemented the scheme discussed herein.

98.    In October 2017, after months of in-person meetings and telephone conferences between Steward and First Choice executives, First Choice supplied Steward with an estimate of the number of inpatient and ambulatory care center surgeries First Choice projected to perform in 2018. First Choice and Steward also exchanged an outline of warranties that made it clear the partnership existed to drive business to Steward hospitals since one of them stated, "[First Choice] will realign surgery loads between hospitals and ASC to net best practice for both parties."

99.    PowerPoint presentations accompanied the outline. In one presentation titled "Steward Health Care System & First Choice Healthcare Solutions, A Partnership to Drive Growth in Brevard County," steps to effectuate the scheme crystalized through the parties' plan for First Choice to recruit neurosurgeons to increase orthopedic call coverage at Steward facilities and

increase surgeries at Steward facilities. The goal of the "Recruitment and Retention" plan was for First Choice to work with Steward to align and integrate all medical services as agreed. The attachments were put together in a presentation which would then be given to Callum.

100.    In an October 12, 2017 email to Romandetti, Crowley asked whether all Steward-affiliated hospitals in the Space Coast area could benefit from the partnership with First Choice. In other words, could all Steward affiliated hospitals in the Space Coast area be available for First Choice to send referrals.

101.    The next day, a spreadsheet was circulated detailing how the 1,225 incremental surgeries would flow to Steward Rockledge, Steward Melbourne, and Steward Sebastian River – Dr. Lambardo would add 204, Dr. Sands would add 300, Dr. Hynes would add 219, Dr. Billys would add 110, Dr. Hardy-St. Pierre would add 100 and Dr. Datta would add 67.

102.    First Choice also provided a breakdown of its payor mix – 37.2% of its orthopedic patients use Medicare with Tricare adding 7.35%. Government insurance paid for 42.04% of Medicare spine patients with Tricare adding 5.26%.

103.    Crowley referred to the partnership as the "biggest no brainer in the history of man. And if they can't see this, I need to find a new company to work for."

104.    Callum, Putter, Knell and Tom Bowden, the chief operations officer of the central division, participated significantly in negotiations concerning the realignment of surgeries to Steward facilities both through in-person meetings and email exchanges.

105.    Crowley told Romandetti that the "investment" was being made in exchange for surgeries. Crowley, Callum, Putter, Romandetti, and First Choice's Kris Jones and Phillip Keller privately discussed the "incremental" benefits in breakout sessions during the months leading up to the finalization of the partnership.

106.     The Relator's principal was made aware that, following discussions with lawyers, executives from First Choice and Steward "understood" that certain elements of the deal could not be put in writing over concerns that they would raise questions about violations of the Stark Law and AKS on the "stock purchase" deal. These elements included equipment purchases, the realignment of surgeries, and similar details which could be viewed as allowing Steward to manage or direct First Choice or would show an exclusive arrangement between the two companies.

107.     Crowly even provided First Choice with Steward's strategy to expand within Indian River County, Steward Sebastian River's home county, which included a master list of doctors, their affiliates, and specialties generated by Steward to aid First Choice in recruiting so they could target the unmet needs of Steward's three hospitals.

108.     In a December 29, 2017 email, Callum instructed staff to check on the stock purchase agreement, adding that he is "trying to get this across the finish line."

109.     In a January 2018 email chain, Romandetti sought to confirm that the partnership was going to be completed, to which Callum replied that he would have a call with the attorneys on January 4, 2018 to discuss. Callum was copied on meeting agendas between Steward and First Choice, including analysis spreadsheets distributed to high level Steward executives at the time.

110.     On February 8, 2018, Steward and First Choice announced their "strategic partnership"[3] that would "allow [First Choice] to expand its delivery system of orthopedic and spine care, with the assistance of Steward and its resources." The partnership would allow First Choice to "implement their platform" into Steward's network.

111.     In February 2018, First Choice and Steward finalized their "strategic partnership." Callum was among the Steward executives who signed the agreement purchasing First Choice

---

[3] https://www.globenewswire.com/news-release/2018/02/08/1336178/0/en/Steward-Health-Care-Announces-Strategic-Partnership-with-First-Choice-Healthcare-Solutions.html

stock. In accordance with their agreement, Steward purchased 5 million shares of First Choice, or 15.5% of the company, at $1.50 a share for $7.5 million. The agreement prohibited the money from being used to retire debt, redeem stock, or settle outstanding litigation. Based on the history of First Choice stock sales, Steward overpaid for the stock by between 20% and 50%.

112.    For example, in 2017, First Choice's stock price fluctuated from $0.97 to $1.73 per share. However, from the time negotiations began in June 2017 until the purchase was announced in February 2018, the stock price only met or exceeded $1.50 per share two times in June 2017, never reaching $1.50 again. During that time, investors paid $1.25 per share on average, an astounding 20% less than Steward.

113.    The average share price may not adequately reflect the stock's value. First Choice is a low-volume stock sold over the counter. The company warned potential investors its stock may not be actively traded and the bid and ask prices for its shares may fluctuate. First Choice stock traded at about $1 per share during much of the negotiation period. The price increased when word of an impending deal with Steward leaked, artificially increasing the stock price before the deal was finalized.

114.    CFO Keller estimated that Steward overpaid by 50%. Unsurprisingly, Steward never conducted a fair market value analysis of First Choice's worth.

115.    After the deal was finalized, Steward and First Choice hit the ground running and began taking affirmative measures to implement the illegal referral scheme. On February 20, 2018, senior officials of both companies discussed realigning surgeries and hiring staff to direct expensive and profitable procedures to Steward Melbourne, Steward Rockledge, and Steward Sebastian River, according to the agenda for a meeting with Steward Vice President Crowley, Putter and Gicca, the president of Melbourne Regional Hospital.

29

116.     Over the next few months, First Choice and Steward executives met regularly – as often as once a week – to discuss hiring doctors who could provide services to Steward, transferring business to First Choice, the increase or decrease of surgeries to Steward Melbourne, Steward Rockledge, and Steward Sebastian River and the impact on revenue.

117.     These meetings featured a "punch list" of action items to be completed by First Choice or Steward executives. Reports tallied the number of surgeries directed to each hospital noting which physicians performed the surgeries and the gross revenue derived from each surgery. The totals compared performances to the previous month and the previous year.

118.     Notably, First Choice did not engage in similar discussions with Health First, the largest healthcare system in the area who accounted for more than 20% of First Choice's business. As one First Choice executive put it, Health First did not own a 15% stake in the company.

119.     In an April 27, 2018 email, Romandetti summarized their efforts to Steward's central division president, Putter, discussing the number of cases provided to Steward's local hospitals. Romandetti asked to review Steward's year-over-year numbers to determine which "doctors have the most opportunity to move their current book of business to your locations."

120.     According to Romandetti, it was not about directing all surgeries to Steward, but directing the most profitable. To implement this strategy, Romandetti suggested they hire surgeons who could perform the more profitable surgeries for Steward, indicating they should "be smart enough to figure out what type surgeries we would rather have and which ones are not nearly as important." Romandetti asked to be advised "on how we go about obtaining this so we just don't go after hiring doctors to give us a lot of nonprofitable surgeries."

121.     First Choice and Steward implemented this strategy and revenue increased by 43%. According to Gicca, Melbourne Regional experienced a $5.4 million increase in revenue, which

was 70% of the $7.5 million "investment" made by Steward just six months earlier.

122.    In weekly meetings, email messages and conference calls, Steward's local and corporate executives tracked surgeries, discussed hiring doctors to direct incremental business to the hospitals and prevent "leakage" – referring patients outside Steward and its affiliates.

123.    On March 2, 2018, First Choice and Steward publicly announced their "strategic partnership."[4] Again, the parties described the partnership in vague terms and alluded to a "healthcare delivery platform." In the announcement, First Choice described itself as a "healthcare delivery platform" that aims to expand "its network of non-physician owned medical centers of excellence." The partnership between First Choice and Steward was boasted to "First Choice has been given the opportunity to expand its orthopedic and spine care delivery platform into Steward's nationwide hospital network."

124.    On May 3, 2018, a "punch list" indicated that Putter authorized two Steward doctors to become employees of First Choice "or their termination."

125.    On June 18, 2018, another "punch list" was specifically assigned to Knell includuing the tasks of (a) identifying additional Orthopedic physicians in order to "hit the right ortho" to account for missing cases and specialties, (b) meeting with the Steward Rockledge hospital president to discuss a plan to increase surgical care for Steward, (c) providing profitability by case/type/physician/facility to evaluate profitability for Steward by the next meeting; and (d) implement a "control tower" position that would help direct surgeries from First Choice to Steward hospitals.

126.    On September 28, 2018, Romandetti forwarded Callum a "high level" spreadsheet

---

[4] https://www.globenewswire.com/en/news-release/2018/03/02/1414150/0/en/First-Choice-Healthcare-Solutions-Announces-Closing-of-Strategic-Partnership-with-Steward-Health-Care.html

showing the increase in cases and revenue at Steward Hospitals.

127.    The thrust of First Choice's pitch and value proposition, or its so called "healthcare delivery platform," was to increase referrals from First Choice to Steward to boost revenue for Steward. First Choice attracted Steward because it promised to own the referral process. First Choice did so during its strategic partnership when it tracked each surgery performed, which physician performed the surgery, and the revenue it generated in order to ensure Steward would receive its return on investing in First Choice. Callum, Putter, de la Torre, and Knell participated in this process by keeping track of the number of cases provided to Steward by First Choice and urging First Choice to keep a steady increase of referrals to boost profits.

128.    First Choice represented itself to be merely a provider of a unique "delivery platform" when in truth, First Choice provided Steward with the type of patients it needed to fill surgery slots to drive up revenue. First Choice did not have a "platform." Rather, its business model, by nature of their concentration in treating patients in orthopedics, spine surgery, interventional pain management, and physical therapy among others, had a revolving door of patients ready at its disposal to refer to Steward.

129.    First Choice's hiring decisions were considered in conjunction with Steward.  First Choice and Steward executives discussed salaries, whether physicians would be exclusives to Steward, and whether Steward should buy out a non-compete clause for a doctor being hired by First Choice and the impact on the hospitals.

130.    First Choice employed physicians that would perform surgeries at Steward's facilities. Steward guaranteed the salaries of the First Choice's contracted physicians by making the physician sit on the referring side as well as the treating side. The blurred relationship invariably corrupted the physician's medical judgment and assisted in achieving Steward's goal of

receiving exclusive referrals and retaining top talent. For example, First Choice offered Dr. B a position to practice at Steward Rockledge in Spring 2018. Romandetti advised Putter that "the only way this becomes a net positive deal for you is if we back fill his surgeries for Melbourne."

131.    First Choice's contracted physicians saw an increase of Medicare fee-for-service charges after the "strategic partnership" began. *See* e.g., Dr. H's total fee-for-service charges increased from $199,053 in 2017 to $241,268 in 2018; Dr. L's increased from $282,067 to $295,127; and Dr. S's increased from $454,571 to $539,433.

132.    First Choice employed 11 physicians to perform surgeries at Steward facilities. The average Medicare fee-for-service payment for these orthopedic surgeons totaled $663,262. There are 1,604 orthopedic surgeons in Florida and the average Medicare fee-for-service payment of orthopedic surgeons in Florida is $405,256. Of the 7 orthopedic surgeons among the First Choice/Steward physicians performing surgeries at Steward facilities during the 2017-2020 period, only two received less than $1 million in total Medicare fee-for-service payments. Two of the orthopedic surgeons received more than six times the Florida state average.

133.    Crowley asked a Steward consultant to calculate the number of inpatient and outpatient orthopedic and spine patients in Brevard County and Indian River County. The former President of Steward Sebastian River, Kelly Enriquez, provided Crowley a "leakage" report showing where its physicians were referring patients. Crowly instructed Enriquez to inform First Choice what types of cases were "missing so FC could hire the right ortho." For example, when a neurosurgeon left Crowley, it was necessary to find out how many of that doctor's surgeries would be covered by a First Choice doctor. Putter scheduled a meeting with the President of Steward Sebastian River to discuss using three existing orthopedic doctors working in the Steward system.

134.    In March 2018, the President of Steward Melbourne promised to provide First

Choice officials an updated tally of surgical runs performed at Steward Melbourne each week. In an analysis provided, the number of surgeries directed to Steward Melbourne fell by 16, though "charges are still up" due to the increase in more profitable spine surgeries. Gicca stressed final charges had yet to be determined.

135.     By the end of April 2018, Romandetti provided Putter with detailed information about where surgeries were performed and what could be shifted to Steward hospitals. The initial review concluded 121 surgery cases were eligible to be moved to a Steward facility. Later, a more detailed breakdown charted the number and percentage of surgeries by month, by facility, by doctor and cases linked to insurance plans affiliated with Health First. A revised analysis said 93 surgeries could be moved to Steward.

136.     These detailed analyses were prepared in advance of telephone conferences with Romandetti, Putter, Knell, and Crowley and discussed with each of them. A detailed breakdown was also sent to Putter and Crowley.

137.     In June 2018, Bowden thanked First Choice for preparing a "punch list" to ensure "we are completing items of value to the partnership timely." The punch list items scheduled for discussion with senior Steward executives included: Steward's hiring of a staffer to direct profitable surgeries to the hospital chain, the hiring of new physicians at First Choice, the purchase of new equipment, and the identification of open blocks of time in the surgery suites.

138.     On June 12, 2018, Bowden arranged a meeting in Boston between Romandetti, Callum, Knell, and John Polanowicz, the Steward Chief Operating Officer. The executives put together various reports and analysis of the progress so far, including the new "Control Tower" position created to oversee directing expensive and profitable surgeries to Steward Hospitals.

139.     As part of its "investment," Steward was to move its physical and occupational

therapy and orthopedic business from its hospitals in three Florida Hospitals to First Choice. In early February 2018, a "punch list" assigned the task to increase physical therapy referrals to Putter. The transfer of physical, occupational, and speech therapy cases started slowly. However, First Choice made its displeasure known to Steward executives that First Choice received only 19 of 540 outpatient physical, occupational, and speech referrals from Steward.

140.    Steward and First Choice's relationship frayed in September 2018 after a dinner between Callum, Romandetti, Renna, and Knell. The Steward representatives expressed concern that Steward was not getting the referrals it needed to see a return on its investment. A week later, Keller prepared a financial reconciliation that showed surgical revenue increased by $3.5 million in less than eight months. The data showed that Steward Melbourne and Steward Sebastian River's surgery count increased by 52 cases.

141.    The September 2018 meeting was ostensibly a check-in on Steward's return on investment. Reports that detailed the surgical statistics and surgical volume. Steward prepared a financial analysis highlighting case trends.

142.    To ensure First Choice met its goals, Romandetti directed staff "to make sure we have enough surgery days over the next three months to achieve our goal that we represented we would."

143.    Emails detailed every change in the surgeries scheduled, no matter how minor.  One patient had second thoughts and postponed, another could not undergo surgery because he did not stop taking blood thinners in time. To meet First Choice's goals, staff plugged holes in surgery schedules by convincing patients to move up procedures and shifting "small" cases that could have been handled outside the hospital to Steward.

144.    In November 2018, First Choice stock plummeted after the Securities and

35

Exchange Commission (SEC) alleged in a separate lawsuit that Romandetti was a part of a conspiracy to manipulate First Choice's market price and trading volume from 2013-2016.

145.    Steward then recruited First Choice orthopedic surgeons with offers to increase their compensation at least $100,000 per year. For example, Doctors Harrison, Sands, and Lombardo accounted for 1,000 of Steward's surgeries from January 2018 through August 2018, more than half of which were performed through First Choice. All three doctors are paid in excess of market value. Similarly, four doctors at an affiliate orthopedic practice controlled by First Choice generated 900 surgeries during that same period.

146.    Steward continued hiring doctors away from other practices, offering well above market price and additional compensation and bonuses, including Doctors, Lombardo, Sands, Harrison, and DeLorenzi. In September 2020, Steward offered a physician with Suntree Internal Medicine a lump sum of $250,000 to sign a contract with Steward that required the doctors to refer patients to the Steward Healthcare Network. The doctor indicated that Steward representatives visited his office daily and wanted his patient list and Knell was personally on calls to discuss the transaction. The doctor executed the contract and Steward promised to indemnify him for damages and legal ramifications for his actions.

147.    First Choice's "healthcare delivery platform" amounted to nothing more than an illegal referral system by which Steward could supplement its need for physicians in its operating rooms. First Choice provided the physicians and patients to ensure maximal use of Steward's facilities. The strategic partnership directly provides remuneration to the referral source (First Choice "caregivers" who refer patients to Steward) and directly provides remuneration to the revenue source (Steward physicians who perform the surgeries) to encourage physicians to complete as many surgeries as possible. In actuality, the strategic partnership makes these

36

distinctions illusory because the First Choice physicians who are referring patients to Steward hospitals are doing it at the direction of Steward executives. The exclusive referrals for inpatient surgeries are driven by the strategic partnership because First Choice "caregivers" are referring patients to Steward solely based on its investment in First Choice. First Choice "caregivers" determine the patient's level of care and what hospital will provide the best care.

148.    The strategic partnership model poisons the medical determination because it is designed to generate medically unnecessary surgeries and to funnel such surgeries to Steward, though they can be performed by a non-Steward physician.

**A.    The Realignment Scheme Violates the Anti-Kickback Statute**

149.    The Steward Physician and First Choice "caregivers" are provided illegal remuneration by way of referring all surgery patients to Steward hospitals and all physical, speech, and occupational therapy patients to First Choice, including exclusive referrals of patients to Steward for orthopedic surgeries.

150.    The Realignment Scheme also violates the AKS because the Steward's physicians pay greatly exceeds arms-length fair market compensation.

151.    The First Choice business model looks to find specialty where volume is lacking and assist in building volume. First Choice effectuates its model by providing the referrals to specialty where the volume is lacking. Therefore, its exclusive referral system is unequivocally intended to induce unlawful referrals and, therefore, violates the AKS.

**(i) The Realignment Scheme Does Not Meet Any AKS "Safe Harbors."**

152.    The Realignment Scheme does not qualify for any AKS "Safe Harbors." The "Personal Services Management Contracts" safe harbor is inapplicable To meet the Personal Services and Management Contracts Safe Harbor, all seven of the applicable standards must be

met. The Realignment Scheme glaringly fails to meet at least two key standards: (1) the aggregate compensation is not consistent with the fair market value in an arm's length transaction; and (2) the "caregivers" that referred patients to Steward only did so because the strategic partnership between Steward and First Choice explicitly directed them to do so. *See* 42 C.F.R. 1001.952(d)

**B.   The Realignment Scheme Violates the Stark Law**

153.     The Realignment Scheme violates the Stark Law Limitation of Certain Referrals. *See* 42 U.S.C. 1395nn. Physicians who performed surgery at Steward facilities were hired by First Choice, but their salary was guaranteed by Steward. The physicians have a "financial relationship" with Steward because the physician receives remuneration from Steward and therefore has a "compensation relationship" with Steward. *See* 42 U.S.C. 1395nn(a)(2); 42 U.S.C. 1395nn(h)(1)(A).

154.     The physician services, or "professional fee" services that Steward bills on behalf of its patients, are DHS. *See* 42 U.S.C. 1395nn(h)(6); *See also* 66 Fed. Reg. 856, 941-942 (Jan. 4, 2001).

155.     The Realignment Scheme violates the Stark Law, because by Steward guaranteeing First Choice's physician salaries while it receives exclusive referrals from them, Steward is paying the physician to certify the need for DHS – which constitutes a prohibited referral.

156.     Specifically, physicians who performed surgeries at Steward facilities had a "direct compensation relationship" with Steward because remuneration passes between the referring "caregiver" at First Choice and Steward without any intervening persons or entities. *See* 42 C.F.R. 411.351.

157.     Therefore, Steward habitually violated the Stark Law because First Choice contracted physicians have a financial relationship with Steward. Steward guaranteed First Choice

38

contracted physicians to perform surgeries at Steward facilities while First Choice "caregivers" exclusively referred patients to Steward. The patients referred by First Choice became Steward patients and when Steward furnished DHS, it billed the services through CMS Form 1500 and was paid by the Medicare and Medicaid programs. Consequently, each referral made by a First Choice "caregiver" for a surgery to be performed at a Steward facility by a Steward-backed physician is a prohibited referral in violation of the Stark Law.

158.    Moreover, the Realignment Scheme violates the Stark Law because Steward submitted claims for DHS that are furnished pursuant to prohibited referrals. 42 U.S.C. 1395nn(a)(1)(B). These false claims are those submitted and billed as inpatient services through the hospital's Form CMS-1490 claims and annual Cost Reports. Steward caused such claims to be committed and violations of the Stark Law.

### (i) The Realignment Scheme Does Not Qualify for Any Stark Law Exceptions

159.    The Realignment Scheme does not qualify for any "group practice," "*bona fide* employment relationships" or "personal services arrangements" Stark Law exceptions because Steward guaranteed First Choice contracted physician salaries for the sole purpose of receiving First Choice's exclusive referrals.

160.    Moreover, the Realignment Scheme does not qualify for any Stark law exceptions, because the direct compensation that Steward provides to First Choice physicians is directly determined by taking into account the volume or value of referrals and far exceeds fair market value. *See* 42 U.S.C. § 1395nn(e); 42 CFR § 41 l.357(c); 42 C.F.R. § 411.357(p); 42 C.F.R. § 41 l.354(d)(4).

### FALSE CLAIMS SUBMITTED OR CAUSED TO BE SUBMITTED BY DEFENDANTS

161.    Steward Hospitals submitted or caused the submission of thousands of false claims

between 2018 through 2020. Steward Rockledge, Steward Melbourne, and Steward Sebastian River utilized First Choice physician referral system, making thousands of false professional fee claims which were inpatient professional fee claims tainted by illegal remuneration for inpatient referrals. These claims – inpatient professional fee claims submitted subsequent to a First Choice contracted physician completion of a surgery made pursuant to an initial kickback – are false claims because they are submitted in knowing violation of the Stark Law and/or AKS.

162.    The vast majority of the false claims made by Steward are false claims related to Steward's submission of false claims for inpatient surgeries through CMS Form 1450 and the annual cost report. The surgeries that were the subject of these claims were performed by First Choice contracted physicians at Steward facilities while Steward guaranteed the physician's salary in violation of the Stark Law or AKS or both.

163.    Relator Omni has knowledge of hundreds of specific false claims for surgery that Steward caused to be submitted at its three Space Coast hospitals. The data demonstrates the effect of the illegal referral system employed by Steward.

164.    From the initiation of the Steward-First Choice "strategic partnership," First Choice directed thousands of patients to Steward facilities. Between 2018 to 2020, First Choice referred 2,393 patients to Dr. L, 2,485 patients to Dr. S, 164 patients to Dr. H, and 38 patients to Dr. A.

165.    In turn, Medicare doled out millions of dollars in Medicare payments to Steward Melbourne, Steward Sebastian River, and Steward Rockledge during the "strategic partnership." For example, Steward Rockledge increased its outpatient and inpatient Medicare payments from $31,699,109 to $34,142,899 between 2017 and 2018.

166.    Below are specific examples of patients referred by First Choice to a Steward physician as part of Steward's exclusive referral scheme in violation of the AKS and Stark Law.

| Patient | Referred Entity or Physician | Total Charges | Government Healthcare Program | Total Amount Paid |
|---------|------------------------------|---------------|------------------------------|-------------------|
| Patient 1 | Dr. S | $11,437.36 | Medicare | $1,711.11 |
| Patient 2 | Dr. L | $11,430.80 | Florida Medicare | $1,603.89 |
| Patient 3 | Dr. L | $11,437.36 | Medicare | $1,599.04 |
| Patient 4 | Dr. H | $9,242.68 | Medicare | $1,432.58 |
| Patient 5 | Dr. A | $2,844.68 | Florida Medicare | $695.16 |

167.    The above representative examples of the false claims caused by illegal First Choice referrals in which Steward knowingly and willingly participated. Steward knew that its investment in First Choice would boost its referrals for its orthopedic practice and fraudulently allowed its physicians to accept remuneration for their acceptance of the referrals. By doing so, Steward grew its business and reaped financial rewards by bribing physicians and submitting and causing false claims to be submitted both federally and in Florida, resulting in substantial damage to the United States, the State of Florida, and the overly-strapped healthcare system.

168.    Additionally, all claims submitted to both the federal and state governments that include items or services resulting from a violation of the AKS constitute a false or fraudulent claim for the purposes of the FCA. 42 U.S.C. § 1320a-7b(g). Courts have consistently held that violations of the AKS give rise to additional causes of action under the FCA. *See United States ex rel. Capshaw v. White,* Civil Action No. 3:12-CV-4457-N, 2018 U.S. Dist. LEXIS 197495, at *2 (N.D. Tex. Nov. 20, 2018); *See also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997).

## COUNT ONE

### FEDERAL FALSE CLAIMS BASED ON ANTI-KICKBACK STATUTE
### 31 U.S.C. § 3729(a)(1)(A); 42 U.S.C. § 1320a-7b(b)

169.     Relator adopts and incorporates the previous paragraphs as though fully set forth herein. This claim sets forth claims for treble damages and civil penalties under the FCA.

170.     By and through the fraudulent schemes described herein, Defendants knowingly–by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval.

171.     By virtue of illegal remuneration (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)) and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for the improper payment or approval of physician services and inpatient and outpatient care on behalf of federal health care beneficiaries.

172.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

173.     Defendants' fraudulent actions have resulted in damage to the United States equal to the amount paid by the United States as a result of the Defendants' fraudulent claims.

**WHEREFORE**, Relator demands judgment in its favor on behalf of the United States and against Defendants, jointly and severally, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs and interest and such other, different or further relief to which Relator may be entitled.

## COUNT TWO

### FEDERAL FALSE CLAIMS BASED ON STARK LAW
### 31 U.S.C. § 3729(a)(1)(A); 42 U.S.C. § 1396nn

174.     Relator adopts and incorporates the previous paragraphs as though set forth herein.

175.     By and though the fraudulent schemes described herein, Defendants knowingly–by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval.

176.     By virtue of prohibited referrals (in violation of the Stark Law, 42 U.S.C. § 1395nn) and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for the improper payment or approval of physician services and inpatient and outpatient care on behalf of federal health care beneficiaries.

177.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

178.     Defendants' fraudulent actions have resulted in damage to the United States equal to the amount paid by the United States as a result of the Defendants' fraudulent claims.

**WHEREFORE**, Relator demands judgment in its favor on behalf of the United States and against Defendants, jointly and severally, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

## COUNT THREE

## MAKING OR USING FALSE STATEMENTS OR RECORDS
## MATERIAL TO A FALSE CLAIM
## 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B)

179.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

180.    By and through the fraudulent schemes described herein, Defendants' knowingly–by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims for payment or approval to the United States or made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, to wit: Defendants created or used false billing submissions; false Medicare enrollment certifications, and false Medicare billing certifications all in violation of 42 U.S.C. § 1329(a)(1)(A) and (a)(1)(B) and the governing Medicare conditions of payment.

181.    The false records or statements described herein were material to the false or fraudulent claims submitted, or caused to be submitted, by Defendants to the United States.

182.    In reliance upon Defendants' false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

183.    Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States for such false or fraudulent claims.

    **WHEREFORE**, Relator demands judgment in its favor on behalf of the United States and against Defendants, jointly and severally, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729,

attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

## COUNT FOUR

### CONSPIRACY
### 31 U.S.C. § 3729 (a)(1)(C)

184.     Relator adopts and incorporates the previous paragraphs though fully set forth herein.

185.     Defendants knowingly presented, caused to be presented, false or fraudulent claims to the United States for payment or approval by virtual of illegal remuneration (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)) and prohibited referrals (in violation of the Stark Law, 42 U.S.C. § 1395nn).

186.     Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims to the United States by virtue of illegal remuneration (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)) and prohibited referrals (in violation of the Stark Law, 42 U.S.C. § 1395nn).

187.     The United States paid Defendants for such false claims.

188.     Defendants, in concert with each other, their contracted physicians accepting illegal remuneration in exchange for prohibited referrals and its client hospitals with knowledge of Defendants' physician compensation structure, agreed to provide and accept illegal remuneration in exchange for prohibited referrals and submit claims tainted by such referrals in order to increase hospital surgeries and/or admissions and fraudulently increase revenue from government healthcare programs.

189.     Defendants, and co-conspirators, acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the

United States through Medicare or Medicaid.

190.    Defendants' fraudulent actions, in concert with each other and their co-conspirators, have resulted in damage to the United States equal to the amount paid by the United States to Defendants as a result of the Defendants' fraudulent claims.

**WHEREFORE**, Relator demands judgment in his favor on behalf of the United States and against Defendants, jointly and severally, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

## COUNT FIVE

## FLORIDA FALSE CLAIMS ACT
### Fla. Stat. § 68.081(2)(a)

191.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

192.    By virtue of illegal remuneration (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)) and submissions of non-reimbursable claims described above, Defendants knowingly– by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims for the payment or approval of the State of Florida, to wit: Defendants created or used false billing submissions; false Medicare enrollment certifications, and false Medicare billing certifications all in violation of 42 U.S.C. § 1395y and the governing Medicare conditions of payment.

193.    The State of Florida, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

194.    Defendants' fraudulent actions have resulted in damage to the United States equal

46

to the amount paid by the United States as a result of the Defendants' fraudulent claims.

**WHEREFORE**, Relator demands judgment in its favor on behalf of the State of Florida and against Defendants, jointly and severally, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by Fla. Stat. § 68.081, *et seq.*, attorneys' fees, costs and interest and such other, different or further relief to which Relator may be entitled.

### COUNT SIX

### FLORIDA FALSE CLAIMS ACT
### Fla. Stat. § 68.081(2)(b)

195.    Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

196.    By virtue of illegal remuneration (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)) and submissions of non-reimbursable claims described above, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used or caused to be made or used, false records or statement material to a false or fraudulent claim or to get a false or false claim paid or approved by the State of Florida, to wit: Defendants created or used false billing submissions; false Medicare enrollment certifications, and false Medicare billing certifications all in violation of 42 U.S.C. § 1395y and the governing Medicare conditions of payment.

197.    The false records or statements described herein were material to the false claims submitted or caused to be submitted, by Defendants to the State of Florida.

198.    In reliance upon Defendants' false statements and records, the State of Florida paid false claims that it would not have paid if not for those false statements and records.

199.    Defendants' fraudulent actions described herein have resulted in damage to the

State of Florida equal to the amount paid or reimbursed by the United States for such false or fraudulent claims.

      **WHEREFORE**, Relator demands judgment in its favor on behalf of the State of Florida and against Defendants, jointly and severally, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by Fla. Stat. § 68.081, *et seq.*, attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

**COUNT SEVEN**

**CONSPIRACY**
**Fla. Stat. § 68.081(2)(C)**

200.    Relator adopts and incorporates the previous paragraphs though fully set forth herein.

201.    Defendants knowingly presented, caused to be presented, false or fraudulent claims to the State of Florida for payment or approval by virtue of illegal remuneration (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)) and prohibited referrals (in violation of the Stark Law, 42 U.S.C. § 1395nn).

202.    Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims to the State of Florida by virtue of illegal remuneration (in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)) and prohibited referrals (in violation of the Stark Law, 42 U.S.C. § 1395nn).

203.    The State of Florida paid Defendants for such false claims.

204.    Defendants, in concert with each other, their contracted physicians accepting illegal remuneration in exchange for prohibited referrals and its client hospitals with knowledge of Defendants' physician compensation structure, agreed to provide and accept illegal remuneration

in exchange for prohibited referrals and submit claims tainted by such referrals in order to increase hospital surgeries and/or admissions and fraudulently increase revenue from government healthcare programs.

205.    Defendants, and co-conspirators, acted, by and through the conduct described *supra*, with the intent to defraud the State of Florida by submitting false claims for payment to the State of Florida through Medicare or Medicaid.

206.    Defendants' fraudulent actions, in concert with each other and their co-conspirators, have resulted in damage to the State of Florida equal to the amount paid by the State of Florida to Defendants as a result of the Defendants' fraudulent claims.

**WHEREFORE**, Relator demands judgment in his favor on behalf of the State of Florida and against Defendants, jointly and severally, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by Fla. Stat. § 68.081, *et seq.*, attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

**PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS.**

Dated: November 27, 2023

Respectfully submitted,

SPIRO HARRISON & NELSON LLC

By:    _/s/ David B. Harrison_          

David B. Harrison (*pro hac vice*)
363 Bloomfield Ave, Suite 2C
Montclair, New Jersey 07042
Phone: (973) 232-4109
Fax: (973) 509-9521
dharrison@shnlegal.com

Svjetlana Tesic (*pro hac vice*)
363 Bloomfield Ave, Suite 2C
Montclair, New Jersey 07042
Phone: (973) 744-2100
Fax : (973) 509-9521
stesic@shnlegal.com

**Lead Counsel for Relator**

Jessica Glitz
Texas Bar No.: 24076095
Johnson Law Group
2925 Richmond Ave., Suite 1700
Houston, Texas 77098
Phone: (713) 626-9336
Fax: (713) 583-9460
jglitz@johnsonlawgroup.com

**Local Counsel for Relator**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 27, 2023, I caused a true copy of the foregoing Plaintiff/Relator's Amended *qui tam* Complaint to be filed with the Clerk of the United States District Court for the District of Northern Texas using the CM/ECF System. Notice of this filing was simultaneously served upon all counsel of record through the CM/ECF System.

Dated: November 27, 2023

*/s/ Svjetlana Tesic*
Svjetlana Tesic