**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | ) | |
| STATE OF FLORIDA | ) | |
| *ex rel.* OMNI HEALTHCARE, INC. | ) | |
| | ) | |
| | ) | Case No.: 3:21-cv-00870-S |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEWARD HEALTHCARE SYSTEM | ) | |
| LLC; STEWARD HEALTH CARE | ) | |
| HOLDINGS LLC; STEWARD HEALTH | ) | |
| CARE INVESTORS, LLC; STEWARD | ) | |
| PHYSICIAN CONTRACTING, INC.; | ) | |
| STEWARD MELBOURNE, INC. d/b/a | ) | |
| MELBOURNE REGIONAL MEDICAL | ) | |
| CENTER; STEWARD ROCKLEDGE | ) | |
| HOSPITAL, INC. d/b/a ROCKLEDGE | ) | |
| REGIONAL MEDICAL CENTER; | ) | |
| STEWARD SEBASTIAN RIVER | ) | |
| MEDICAL CENTER, INC. D/B/A | ) | |
| SEBASTIAN RIVER MEDICAL CENTER | ) | |
| RALPH DE LA TORRE; MICHAEL CALLUM; | ) | |
| DANIEL KNELL; JOSH PUTTER; TIM | ) | |
| CROWLEY and JAMES RENNA, | ) | |
| | ) | |
| Defendants. | ) | |

---

**MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT**

---

SPIRO HARRISON & NELSON
David B. Harrison (*pro hac vice*)
Svjetlana Tesic (*pro hac vice*)
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
(973) 744-2100
dharrison@shnlegal.com
stesic@shnlegal.com

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY........................................... 3

LEGAL STANDARD......................................................................................................... 8

ARGUMENT ...................................................................................................................... 9

      I.   THE AMENDED COMPLAINT ADEQUATELY PLED
           FCA CLAIMS AGAINST EACH DEFENDANT, SATISFYING
           THE RULE 9(B) PLEADING STANDARDS ............................................................ 9

              **A.**  **The AC Sufficiently Pled the Details of a Fraudulent Scheme to Submit
                     False Claims Promulgated by the Defendants**............................................. 10

              **B.**  **The AC Quite Clearly Does Not Engage in Group Pleading** .................... 12

              **C.**  **The AC Sufficiently Pled the Requisite Scienter for the Defendants**....... 19

              **D.**  **Relator Adequately Pled Stark Law Violations** ......................................... 20

              **E.**  **Relator Pled Particular Allegations that Claims Were Submitted to
                     Medicare and TRICARE** ............................................................................ 23

              **F.**  **Relator Adequately Pled Florida State Law FCA Claims** ......................... 24

     II.  THE DEFENDANTS MISSTATE THE CAUSATION
          STANDARD UNDER THE AKS ............................................................................ 24

CONCLUSION.................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................8

*Atrium Med. Corp.*, No. CV SA-13-CA-244-OLG,
    2014 WL 12879671 (W.D. Tex. Dec. 31, 2014) ................................23

*Bailey v. Mansfield Indep. Sch. Dist.*,
    425 F. Supp. 3d 696 (N.D. Tex. 2019) ..............................................12

*Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.,*
    976 F.3d 585 (5th Cir. 2020) ............................................................11

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................8

*Betts v. Wells Fargo Home Mortg.*, Civil Action No. 3:15-CV-2016-G,
    2016 U.S. Dist. LEXIS 87405, at *13 (N.D. Tex. June 13, 2016) .............8

*Guidry v. United States Tobacco Co.*,
    188 F.3d 619 (5th Cir. 1999) ..........................................................

*Hart v. Bayer Corp.*,
    199 F.3d 239 (5th Cir. 2000) ............................................................25

*Health Choice All., LLC v. Eli Lilly and Co., Inc.*, No. 5:17-CV-123-RWS-CMC,
    2018 WL 4026986 (E.D. Tex. July 25, 2018) ..................................10

*Jacobs v. Bank of Am. Corp.*, No. 1:15-CV-24585-UU,
    2016 WL 11653744 (S.D. Fla. Dec. 20, 2016) ................................24

*Sonnier v. State Farm Mutual Auto. Ins. Co.*,
    509 F.3d 673 (5th Cir. 2007) ............................................................24

*Sosa v. Coleman,*
    646 F.2d 991 (5th Cir. 1981) ..............................................................8

*Tuchman v. DSC Communications Corp.*,
    14 F.3d 1061 (5th Cir.1994) ............................................................19

*U.S. ex rel. Colquitt v. Abbott Lab'ys*,
    864 F. Supp.2d 499 (N.D. Tex. 2012) ..............................................15

*U.S. ex rel. Kester v. Novartis Pharmaceuticals Corp.*,
    41 F.Supp.3d 323 (S.D.N.Y. 2014) ..................................................25

*U.S. ex rel. Mastej v. Health Management Associates, Inc.*,
    591 F. App'x 693 (11th Cir. 2014) ..................................................24

*United States ex rel. Bruno v. Schaeffer*,
    328 F. Supp. 3d 550 (M.D. La. 2018) ............................................................................16, 20

*United States ex rel. Capshaw v. White*, No. 3:12-CV-4457-N,
    2018 WL 6068806 (N.D. Tex. Nov. 20, 2018).................................................................9, 16

*United States ex rel. Carter v. Emergency Staffing Sols., Inc.,* Civil Action No. 3:19-cv-1238-E,
    2023 U.S. Dist. LEXIS 56114, at *12 (N.D. Tex. Mar. 31, 2023).........................................19

*United States ex rel. Emerson Park v. Legacy Heart Care, LLC*, No. 3:16-CV-0803-S,
    2019 U.S. Dist. LEXIS 161266 (N.D. Tex. Sep. 17, 2019) .....................................................8

*United States ex rel. Gage v. Aviation*, No. A-12-CA-904-SS,
    2014 WL 3007201 (W.D. Tex. July 2, 2014) .........................................................................8

*United States ex rel. Greenfield v. Medco Health Sols., Inc.*,
    880 F.3d 89 (3d Cir. 2018) ...................................................................................................25

*United States ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ............................................................................................8, 9

*United States ex rel. Hernandez v. Team Fin., L.L.C.*, No. 2:16-CV-00432-JRG,
    2020 WL 731446 (E.D. Tex. Feb. 13, 2020)........................................................................22

*United States ex rel. Johnson v. Raytheon Co.*,
    395 F. Supp. 3d 791 (N.D. Tex. 2019) ..................................................................................8

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
    575 F.3d 458 (5th Cir. 2009) ................................................................................................9

*United States ex rel. Ruscher v. Omnicare, Inc.*,
    663 F. App'x 368 (5th Cir. 2016) .........................................................................................9

*United States ex rel. Russell v. Epic Healthcare Mgmt. Group*,
    193 F.3d 304 (5th Cir. 1999) ................................................................................................8

*United States ex rel. Wall v. Vista Hospice Care, Inc.*,
    778 F. Supp. 2d 709 (N.D. Tex. 2011) ..................................................................................9

*United States v. Catholic Health Initiatives*, No. 4:18-CV-123,
    2022 WL 2657131 (S.D. Tex. Mar. 31, 2022) .....................................................................16

*United States v. Davis*,
    132 F.3d 1092 (5th Cir. 1998).............................................................................................16

*United States v. Planned Parenthood Fed'n of Am. Inc.*,
    601 F. Supp. 3d 97 (N.D. Tex. 2022) ..................................................................................14

*Yu-Chin Chang v. Upright Fin. Corp., No. 19CV18414KMJBC*,
    2020 WL 473649 (D.N.J. Jan. 28, 2020) ............................................................................13

**Code**

31 U.S.C. § 3729(a). ...................................................................................................3, 19

42 U.S.C. § 1320a-7b.................................................................................................3, 10

42 U.S.C. § 1395nn...................................................................................................3, 20


155 Cong. Rec. S10854 (daily ed. Dec. 21, 2010).......................................................10

Fla. Stat. § 68.081 ...........................................................................................................3

Plaintiff-Relator Omni Healthcare, Inc. ("Omni" or "Relator") respectfully submits this consolidated memorandum of law in opposition to the motion to dismiss the Amended Complaint ("AC") (ECF No. 72) filed by defendants Steward Health Care System, LLC ("Steward"); Stewart Health Care Holdings, LLC; ("Steward Holdings"), Steward Health Care Investors ("Steward Investors"), Steward Physician Contracting ("Steward Contracting"), and Steward Melbourne Hospital, Inc. d/b/a Melbourne Regional Medical Center ("Melbourne"); Steward Rockledge Hospital, Inc. d/b/a Rockledge Regional Medical Center ("Rockledge"); Steward Sebastian River Medical Center, Inc. d/b/a Sebastian River Medical Center ("Sebastian River"); Ralph de la Torre (collectively, the "Steward Defendants") (ECF No. 80); as well as the motions to dismiss the AC filed by defendants Josh Putter ("Putter"); Tim Crowley ("Crowley"); and Daniel Knell ("Knell") (ECF No. 85), and the motion to dismiss the AC filed by defendant Michael Callum ("Callum") (ECF No. 81) (collectively, "Individual Defendants").

## PRELIMINARY STATEMENT

Defendants, in connection with their partnership with First Choice Health Care Solutions, Inc. ("First Choice"), participated in planning, negotiating, executing, and running a fraudulent referral scheme ("Exclusive Referral Scheme") disguised as a mere partnership with First Choice, that required the referral of patients in exchange for kickbacks. This so-called partnership resulted in thousands of improper referrals and caused the Federal Government and the State of Florida to pay millions of dollars in false claims that violated the Anti-Kickback Statute and the Stark Law. Relator and the Government are entitled to recover damages for these false claims under the False Claims Act ("FCA") and the Florida False Claims Act ("FFCA").

Defendants seek dismissal principally on the basis that the AC does not contain specific allegations that: false claims were presented to the government; defendants participated in

presenting false claims to the government; defendants had the requisite scienter; and what false claims the government reimbursed. Defendants also allege that Relator has not satisfied a nonexistent "but-for" causation element to plead a claim under the Anti-Kickback Statute ("AKS"). Defendants' arguments are based on vast mischaracterizations of the AC and should be rejected.

First, Defendants' suggested interpretation of causation under the FCA is patently incorrect, particularly under Fifth Circuit law, as further explained in the Government's Statement of Interest. Similarly, and contrary to the Steward Defendants' bare contention otherwise, the *qui tam* provisions of the FCA are, in fact, constitutional. Second, Relator provides specific examples of Stark Law violations concerning physician recruitment and illegal referral kickback agreements. Third, the AC adequately pled FCA claims under Rule 9(b) pleading standards concerning each of the defendants, who, as discussed below, operated in concert with one another to plan, execute, and participate in the Exclusive Referral Scheme.

The Complaint details: (1) how the defendants controlled First Choice's patient referrals to Steward facilities; (2) how they demanded First Choice maintain a steady influx of patients at the Steward facilities by any means necessary; (3) representative examples of dates, amounts, recipients and payors of the false claims; (4) calculations linking the payments to federal reimbursements; (5) how each defendant participated in the conspiracy; (6) improper physician compensation in excess of market value; and (7) how Steward received the referrals through their exclusive referral agreement. Despite these allegations, the defendants ask the Court to assume facts outside the AC, weigh competing inferences in their favor, and misapply the law.

While the defendants challenge the specificity of the allegations of FCA violations and the requisite scienter for the Stark Law claims, they also claim that the AC "resorts to impermissible

group pleading" with regard to the fourteen defendants, essentially alleging that, but for Steward, the AC contains absolutely no specific claims pertaining to *any* of the remaining defendants. This argument is disingenuous. The AC identifies the nature and extent of *each* of the defendant's roles, participation, and benefits in connection with the Exclusive Referral Scheme. In fact, the AC consistently describes the conspiracy committed by all fourteen defendants, acting in concert toward a common goal, in order to bring profit to their respective entities and individual positions. The AC pled sufficient facts and circumstances that allow this Court to find that *each* defendant participated in the fraudulent scheme and acted with requisite intent in violation of the AKS and the FCA and permit the matter to proceed to discovery.

For these reasons, and as described in more detail herein, the AC sufficiently alleges violations of the federal FCA, 31 U.S.C. §§ 3729, et seq., the FFCA, Fla. Stat. § 68.081 et seq. ("FFCA"), the AKS, 42 U.S.C. § 1320a-7b(b), and the Stark Law, 42 U.S.C. § 1395nn., and Defendants' motions to dismiss should be denied.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Steward, the country's largest for-profit hospital chain, publicly promoted its "strategic partnership" with First Choice as part of a plan to reduce its network's healthcare costs. AC at ¶2. However, in private, Steward executives characterized the purchase of a 15% stake in First Choice in starkly different terms: a "no-brainer" investment to drive an estimated $150 million in business to Melbourne, Rockledge, and Sebastian River – its three faltering Central Florida hospitals. *Id.*

First Choice, whose business model solely involved recruiting and maintaining physicians while strategically referring patients to its hospital partners, presented itself as providing a healthcare delivery platform to its partners *Id.* at ¶¶110; 123; 128. First Choice and Steward's "strategic partnership" would allow First Choice to "expand its delivery system of orthopedic and

3

spine care" with assistance from Steward. *Id.* at ¶110. The financial projections led Steward to pay as much as a 50% premium for First Choice's stock, pledge to build four new operating rooms, and promise to transfer millions of dollars worth of Steward's existing business to First Choice – all in exchange for referrals. De la Torre, James Renna ("Renna"), Callum, Putter, Crowley, and Knell were all high-level Steward executives and/or principals, all of whom were involved in concocting the scheme to refer patients for financial gain. *Id.* at ¶¶15-20.

Chris Romandetti ("Romandetti"), First Choice's CEO, first approached Steward in March 2017, a month after Steward acquired eight hospitals from Community Health Systems. *Id.* at ¶92. Steward's newly acquired hospitals, Melbourne, Rockledge, and Sebastian River ("Space Coast Hospitals") offered 571 beds, which Romandetti saw as an opportunity to implement a fraudulent scheme. *Id.* at ¶¶91-92. In April 2017, in initiating the fraudulent scheme, Ramandetti met with de la Torre, Steward's CEO, to discuss a partnership between the two companies. *Id.* at ¶93. Ahead of the meeting, Romandetti circulated an agenda containing First Choice's business proposal (and true intention behind the "strategic partnership") – First Choice would refer lucrative patients to Steward facilities while moving medically "unnecessary [in-patient] hospital surgeries" to First Choice. *Id.* at ¶94. Romandetti further suggested that it would hire neurosurgeons to exclusively perform surgeries at Steward hospitals if Steward guaranteed the doctors' salaries, in violation of the Stark Law and AKS. *Id.* The other executives became involved in discussions, and, on June 6, 2017, Callum received an email from Crowley that discussed how the exclusive referral scheme would "generate hospital revenue" and "grow[] the network and covered lives." *Id.* at ¶97.

Steward saw the value in investing in First Choice because it knew First Choice guaranteed it would refer patients to Steward facilities—for financial gain. *Id.* at ¶95. First Choice created presentations and financial analyses that outlined how Steward would benefit from this exclusive

referral scheme. *Id.* at ¶¶95-97. To do so, First Choice would first analyze a patient's medical care to see if it was profitable to Steward, and then exclusively refer the most profitable patients to a physician who would perform surgery at a Steward facility. *Id.* Steward executives and principals, including all Individual Defendants, were involved in negotiating and implementing the scheme. *Id.* at ¶¶94-104. A presentation titled, "Steward Health Care System & First Choice Healthcare Solutions, A Partnership to Drive Growth in Brevard County," was given to Callum so he could review First Choice's plan to recruit neurosurgeons which would then increase orthopedic call coverage at Steward facilities and increase surgeries at Steward facilities. *Id.* at ¶99. Callum discussed "incremental benefits" that First Choice and Steward would receive through the ill-gotten gains of the exclusive referral scheme. *Id.* at ¶105.

As the discussions, meetings, and presentations continued, First Choice and Steward refined their responsibilities. *Id.* at ¶¶106-109. *Id.* at ¶¶103-105; 106-109. Crowley even advised Romandetti as to the critical information Steward executives were concerned about to persuade them to invest in First Choice, to further the unlawful scheme. *Id.* at ¶98. The parties discussed the projected growth from the referrals and the exact number of surgeries each doctor needed to perform to increase Steward's revenue. *Id.* at ¶101. First Choice wanted Steward's 15% investment, and Steward wanted patients. *Id.* at ¶105. Steward and First Choice dressed the partnership as one that would "Drive Growth in Brevard County." *Id.* at ¶99. However, the partnership was an exclusive arrangement and all parties involved knew the true illegal intention of the partnership from its inception to its execution. *Id.* at ¶103-107.

Two weeks after the deal was announced on February 20, 2018, Crowley, Putter, and the Melbourne President discussed the implementation of the referral scheme. *Id.* at ¶¶111; 115. The

agenda outlined how surgeries would be "realigned," or redirected, and the type of staff to hire to ensure that expensive and profitable procedures were directed to the Space Coast Hospitals. *Id.*

 Meetings between First Choice and Steward executives, including the Individual Defendants, occurred regularly where the parties discussed the status of hiring doctors who could provide services to Steward, how Steward can best transfer business to First Choice, the number of surgeries directed to the Space Coast Hospitals, and it all impacted revenue. *Id.* at ¶116. The parties circulated reports that tracked the number of surgeries directed to each hospital, which physician performed the surgery, and the gross revenue derived from each surgery to help them track the status of the return on their illegal investment. *Id.* at ¶117. The meetings also discussed preventing "leakage" (patients referred to hospitals other than Steward and its affiliates) to ensure that all the kick-back tainted referrals were being sent to Steward and its affiliates. *Id.* at ¶122.

First Choice was initially successful in diverting profitable patients to Steward facilities since revenue increased 43% in just a couple of months and directing thousands of patients to Steward facilities, plaguing the Medicare and Medicaid programs with unethical referrals. *Id.* at ¶¶ 121; 131. Between 2018 and 2020, First Choice referred thousands of patients, specifically, 2,393 patients to Dr. L, 2,485 to Dr. S, 164 to Dr. H, and 38 to Dr. A. *Id.* at ¶164. Callum, Putter, de la Torre, Knell, and Crowley, among others, actively directed First Choice to refer *profitable* patients to Steward facilities while looking for ways to refer patients back to First Choice. *Id.* at ¶115-119; 122; 124-130; 133-137. Aside from patient referrals, the Individual Defendants were also involved in recruiting physicians by providing input and suggestions into what physicians would allow Steward to generate the most revenue. *Id.* at ¶¶116; 120; 122; 125; 129-130.

First Choice-employed surgeons performed surgeries on First Choice-referred patients who used Medicaid or Medicare at Steward facilities. *Id.* at ¶¶161-167. The average Medicare fee-for-

service payment for the eleven First Choice orthopedic surgeons totaled $663,262. *Id.* at ¶132. In turn, Medicare doled out millions of dollars in Medicare payments to the Space Coast Hospitals during the "strategic partnership." *Id.* at ¶¶161-167. For example, Rockledge increased its outpatient and inpatient Medicare payments from $31,699,109 to $34,142,899 between 2017 and 2018. *Id.* at ¶165. The vast majority of the false claims made by Steward are false claims related to Steward's submission of false claims for inpatient surgeries through CMS Form 1450 and the annual cost report. *Id.* at ¶162. The patients referred by First Choice became Steward patients, and when Steward furnished DHS, it billed the services through CMS Form 1500 and was paid by the Medicare and Medicaid programs. *Id.* at ¶¶154-157; 61-167.

Thereafter, Steward became dissatisfied with First Choice for falling below the projected referral volume. *Id.* at ¶140. To allay Steward's concerns, First Choice shared a financial reconciliation that showed a surgical revenue increase of $3.5 million and a surgery count increase by 52 in less than eight months at Melbourne and Sebastian River. *Id.* Regular "check-ins" were then scheduled to make sure revenue goals under the kickback scheme were met. *Id.* at ¶¶142-143.

Once news broke that First Choice was implicated in a market manipulation scheme, Steward and its executives began to damage control and quickly hired First Choice physicians at above-market salaries. *Id.* at ¶¶144-146. Knell even personally called a Suntree Internal Medicine ("Suntree") physician to sign a contract with Steward that required the doctor to refer patients to the Steward Healthcare Network. *Id.* at ¶146. Overall, the partnership with First Choice tainted the referral process because First Choice-employed surgeons who performed surgeries on First Choice-referred patients at Steward facilities in exchange for financial benefit. *Id.* at ¶¶147-148.

**LEGAL STANDARD**

"Motions to dismiss under Rule 12(b)(6) are disfavored and rarely granted." *Betts v. Wells Fargo Home Mortg.,* Civil Action No. 3:15-CV-2016-G, 2016 U.S. Dist. LEXIS 87405, at *13 (N.D. Tex. June 13, 2016) (citing *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir. 1981)). Under Rule 12(b)(6), a court evaluates the pleadings by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *United States ex rel. Johnson v. Raytheon Co*., 395 F. Supp. 3d 791, 796 (N.D. Tex. 2019) (citations omitted).

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim for which relief may be granted, a plaintiff must plead sufficient facts to state a claim that is plausible on its face. *United States ex rel. Gage v. Aviation*, No. A-12-CA-904-SS, 2014 WL 3007201, at *2 (W.D. Tex. July. 2, 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Generally, FCA claims must meet the heightened pleading standard under Rule 9(b) *See United States ex rel. Russell v. Epic Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir. 1999). Rule 9(b) requires that a plaintiff set forth the "who, what, when, where and how" of the alleged fraud. *Id.* "The Fifth Circuit has given Rule 9(b) a "flexible" interpretation in the FCA context in order to achieve the FCA's remedial purpose." *United States ex rel. Emerson Park v. Legacy Heart Care, LLC*, No. 3:16-CV-0803-S, 2019 U.S. Dist. LEXIS 161266, at *8 (N.D. Tex. Sep. 17, 2019) (citing *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 190 (5th Cir. 2009)). When a complaint alleges "the details of an actually submitted false claim" or "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that the claims were actually submitted," the motion to dismiss should be denied. *Id.*

**ARGUMENT**

**I.    THE AMENDED COMPLAINT ADEQUATELY PLED FCA CLAIMS AGAINST EACH DEFENDANT, SATISFYING THE RULE 9(B) PLEADING STANDARDS**

The Fifth Circuit, in determining the existence of an FCA claim, evaluates: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009). FCA cases may be predicated on violations of the AKS. *See United States ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 722 (N.D. Tex. 2011) (Lynn, J.). Importantly, if a relator's limited access to the defendants' internal systems prevents the relator from alleging "the details of an actually submitted false claim," it must "alleg[e] particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190.

The AKS prohibits any person or entity "from soliciting or receiving any kind of remuneration—be it cash or in-kind, direct or indirect, covert or overt—in exchange for the referring, arranging, purchasing, or ordering of any good, service, facility or item 'for which payment may be made in whole or in part under a Federal health care program.'" *United States ex rel. Capshaw v. White*, No. 3:12-CV-4457-N, 2018 U.S. Dist. LEXIS 197495, at *4-5 (Nov. 20, 2018) (Godbey, J.). A transaction violates the AKS if just one purpose is to induce or reward referrals. *See United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 374 (5th Cir. 2016). Claims procured in violation of the AKS are considered fraudulent for purposes of the FCA, even if the services were provided and billed accurately. *See Parikh*, 977 F. Supp. 2d at 662-63.

Despite the flexible standard applied to FCA pleadings, the defendants incorrectly argue that the AC does not contain "specific detail" to meet the FCA's particularity requirement.

### A. The AC Sufficiently Pled the Details of a Fraudulent Scheme to Submit False Claims Promulgated by the Defendants

Claims to federal healthcare programs premised on an AKS violation are *per se* false under the FCA. *See* 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."). Congress intended "that all claims resulting from illegal kickbacks are considered false claims for purpose of civil action under the [FCA], even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854 (daily ed. Dec. 21, 2010).

The AC alleges a scheme in which Defendants, individually and collectively, created, implemented, and participated in a fraudulent referral scheme to defraud the Government, in violation of the FCA, FFCA,[1] AKS, and Stark Law. The AC sets forth (1) the number of referrals from First Choice to Steward; (2) the dates on which First Choice referred patients to Steward; (3) which Steward facilities were involved in the referral system; (4) the defendants' roles in the scheme directing referred patients; and (5) the mechanism in which the scheme was concealed.

The goal of the First Choice partnership was for First Choice to exclusively refer patients to Steward facilities in exchange for compensation, which did occur, as First Choice referred 2,393 patients to Steward between 2018 and 2020. *Id.* at ¶ 105; 64. Steward guaranteed the compensation of First Choice-employed physicians who performed surgeries at Steward facilities. *Id.* at ¶¶94;

---

[1] Relator's FFCA violation allegations are analyzed under the same standard as the FCA. *See Health Choice All., LLC v. Eli Lilly and Co., Inc.*, No. 5:17-CV-123-RWS-CMC, 2018 WL 4026986 (E.D. Tex. July 25, 2018) (courts should interpret state law false claims consistently with the FCA.). As discussed, *infra*, the AC adequately pled violations of the FCA and AKS under Federal pleading standards. Thus, this Court should find that Relator's analogous FFCA is also adequately pled. Indeed, Relator alleges that the Individual Defendants conduct business in Florida (AC at ¶2) and facilitated the receipt of reimbursements from Florida Medicaid. *Id.* at ¶166.

129-130; 153; 155; 159; 162. These facts sufficiently allege Defendants' participation in the fraudulent scheme that caused the government to pay for kickback-tainted false claims.

Further, the AC provides five examples of specific patients—insured by Medicare or Medicaid—referred by First Choice and treated at Steward facilities by First Choice-employed physicians (the "who"). The AC details precise amounts charged to Medicare and Medicaid, the exact amount actually paid for such care, and identifies the false certifications made in connection with that treatment (the "what"). The AC also alleges the time period of the claims (the "when"), as well as how the tainted claims were billed to a Steward facility (the "where"). Finally, the Complaint details the "Strategic Partnership" between First Choice and Steward, where First Choice exclusively directed profitable patients to Steward (the "how").

Relator alleges exactly how, based on his personal knowledge regarding the existence of email communications, presentations, and spreadsheets, the defendants knew that Steward's "strategic partnership" with First Choice was designed so that Steward would receive exclusive referrals to its Space Coast hospitals. *Id.* at ¶¶94-109. This level of coordination from the individuals shows the scheme's goal was consistent from the beginning. The AC also identifies the fraudulent claims tainted by the kickbacks and even provides a chart containing specific examples of patients referred by First Choice to a Steward physician as part of Steward's exclusive referral scheme, in violation of the AKS and Stark Law. *Id.* at ¶166. Further, the AC points to specific dates, months, and years during which the fraudulent activity occurred. *Id.* at ¶¶93-100.

While the Defendants seek to downplay their respective involvement in the scheme, principally (and transparently) by isolating meetings and communications and describing them as "innocuous," out of context, a reviewing court does not take this approach, but rather must "consider the complaint in its entirety" to evaluate the sufficiency of the pleadings. *See Basic Cap.*

*Mgmt., Inc. v. Dynex Cap., Inc.,* 976 F.3d 585, 589 (5th Cir. 2020) (citations omitted); *see also*
*Yang Wu Int'l, Inc. v. LS & CX, LLC,* No. 4:20-CV-312, 2020 WL 6161548, at \*3 (E.D. Tex. Oct.
21, 2020) (where the defendant alleged that certain language in the specific causes of action was
insufficient under Rule 12(b)(6), the court found that it must not "look at the language of those
causes of action in isolation." But rather, to the Complaint as a whole.)

Reviewing the AC in its totality, it plainly alleges a very coordinated scheme by Defendants
to improperly maximize referrals by paying kickbacks for them. The FCA and the AKS
specifically prohibit this conduct, and thus, the Court should reject Defendants' motions.

**B.  The AC Quite Clearly Does Not Engage in Group Pleading**

The Amended Complaint designates the nature of each of the defendants' roles in the
Exclusive Referral Scheme. *See Medoc Health, LLC*, 470 F.Supp. 3d at 657 (separate allegations
about each individual's role in the scheme were sufficient under Rule 9(b)). Grouping certain
defendants into one allegation, based upon their joint participation in that conduct, does not
automatically necessitate dismissal nor does it prevent a court from discerning which defendants
are allegedly responsible for which allegedly unlawful acts. *See Bailey v. Mansfield Indep. Sch.*
*Dist.*, 425 F. Supp. 3d 696, 712–13 (N.D. Tex. 2019) (denying a motion to dismiss because
although plaintiff sometimes lumped defendants together as a group, read in the context of the
plaintiff's other allegations, the group pleading did not prevent the court from discerning which
defendants are allegedly responsible for which allegedly unlawful acts).

1.  <u>The AC Sufficiently Alleges FCA Claims Against Steward Defendants and de la Torre</u>

The Steward Defendants argue that (1) Relator's AC has insufficient group pleading
because Relator fails to identify which of the 14 defendants committed what actions; (2) after
identifying Steward Holdings, Steward Investors, and Steward Physician Contracting, there are no

further allegations about these entities; and (3) after identifying de la Torre, there are three allegations about him, none of which allege that he acted unlawfully.

First, the AC identifies allegations, among others, identifying which defendant committed what actions, in furtherance of their fraudulent scheme, and how each benefited financially from the scheme. AC at ¶¶93, 96, 108, 114, 161. Relator clearly identifies each of the Steward Defendants' roles in relation to the Steward healthcare enterprise and the individuals. Upon doing so, Relator sets forth what each particular defendant was alleged to have done in each allegation that contains an alleged group pleading.

Second, Relator, in naming Steward Holdings' and Steward Investors' as defendants, sufficiently explains their involvement in the Steward enterprise in relation to the other defendants and their involvement in the scheme through the conspiracy to generate revenue for *all* the named defendants. *Id.* at ¶¶8-10. Steward Holdings, the sole member of Steward, is identified in numerous allegations and holds all of Steward's outstanding common membership interests. *Id.* at ¶¶4, 91, 95. Further, the AC states that Steward Investors holds *all* the membership interests in Steward Holdings, while Steward Contracting is a subsidiary of Steward Medical Group, Inc. and received the five million shares purchased from First Choice. *Id. at* ¶11.

Notably, federal courts have found that it is inappropriate to determine the relationship between defendants at the motion to dismiss stage. *See Yu-Chin Chang v. Upright Fin. Corp.*, No. 19CV18414KMJBC, 2020 WL 473649, at *3 (D.N.J. Jan. 28, 2020) (denying a motion to dismiss and finding that the precise relationship between defendants is not a fact in control of plaintiffs, but can easily be explored in discovery). The AC names Steward's subsidiaries as defendants. This Court has found allegations against a corporate entity in a *qui tam* action "more than sufficient" at the motion to dismiss stage where the corporation has an active role in overseeing its subsidiary's

operations and is involved in investigations of its subsidiary. *United States v. Planned Parenthood Fed'n of Am. Inc*., 601 F. Supp. 3d 97, 116 (N.D. Tex. 2022).

Additionally, Steward Defendants wrongly assert that Relator merely alleges that de la Torre (1) met with the head of First Choice; and (2) tracked referrals from First Choice to Steward hospitals, none of which constitute unlawful actions. The AC describes how de la Torre, the CEO of Steward, implemented and participated in the scheme to defraud the government. AC at ¶¶15, 93-97, 127. De la Torre initiated the group agenda circulated before the meeting which outlined the true intention behind the "strategic partnership. *Id.* at ¶94. De la Torre also implemented the Exclusive Referral Scheme by keeping track of the number of cases diverted to Stewart by First Choice and urging First Choice to keep a steady increase of referrals to boost profits. *Id.* at ¶¶97; 127. Relator's allegations show "more than a sheer possibility" that de la Torre acted unlawfully because he planned and took part in discussions regarding the partnership, the goal of which was illegal. *Ashcroft* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

2. Relator Sufficiently Pled Allegations Against the Steward Space Coast Hospitals

Steward Defendants once again mischaracterize and downplay the AC, contending that the allegations concerning the Steward Space Coast hospitals are vague, general, incomplete, and fall short of the particularity requirement in Rule 9(b). Under the scheme, the three hospitals, which were owned and operated by all defendants, whether through executive roles or ownership and operational control status, were specifically assigned as the recipients of the illegal referral benefits. AC at ¶¶95; 101. Therefore, the broader scheme outlined throughout the AC applies as much to the Space Coast hospitals as the other Defendants, as tainted surgeries and related medical services were performed there, which violated the FCA. Steward Space Coast hospitals cannot and should not escape liability under the FCA as knowing participants of the unlawful scheme.

14

3. Relator Sufficiently Pled Allegations Against Steward Health Care System

The AC sufficiently alleges that Steward violated the FCA because the claims allow the Court to reasonably infer that Steward submitted or caused to be submitted false claims. AC ¶¶161-168; s*ee also U.S. ex rel. Colquitt v. Abbott Lab'ys,* 864 F. Supp. 2d 499, 535 (N.D. Tex. 2012) (denying a motion to dismiss and finding relator's allegations allowed the court to reasonably infer that false claims were actually submitted and provided particular details about a fraudulent scheme to cause the submission of false claims and reliable indicia that claims were actually submitted).

The AC pled the Exclusive Referral Scheme with sufficiently particularity, alleging that: Steward utilized First Choice's physician referral system, making thousands of false professional fee claims which were inpatient professional fee claims tainted by illegal remuneration for inpatient referrals; the majority of the alleged false claims involve Steward's submission of false claims for inpatient surgeries through CMS Form 1450 and the annual cost report, Steward guaranteed the salary of the First Choice physicians who performed surgeries at Steward facilities in violation of the Stark Law or AKS or both; and First Choice directed thousands of patients to Steward facilities between 2018 to 2020 in furtherance of the scheme. AC ¶¶162-164. The AC also provides particular details indicating this scheme caused the submission of false claims that were actually submitted, including examples of specific patients that First Choice referred to Steward facilities to Steward physicians. *Id.* at ¶¶145-148, 164-166.

The Steward Defendants also attempt to argue that healthcare providers traditionally submit claims and Relator provides no allegation that Steward employed practicing physicians or operated medical facilities. However, the AC describes the "Steward Physicians" and contains allegations which contradict these baseless assertions. *Id.* at ¶¶166, 132, 147.

15

Furthermore, the Steward Defendants also argue that Relator uses the term "Steward" to refer to the recipient of certain referrals from First Choice, or the location where surgeries could be performed but Relator is conflating Steward Health Care System with unidentified entities. This is incorrect. Relator clearly defines Steward Health Care Systems in the AC. *Id*. at ¶8. In the AC, Relator uses the term "Steward" to refers to the entire Steward Healthcare-related "hospital chain," as made clear by the context of its other allegations in which it refers to the entire Steward operation as "Steward hospitals" and "Steward hospital systems."

4. <u>Relator Sufficiently Pled Allegations Against the Individual Defendants</u>

The Individual Defendants attempt to characterize their participation as general business discussions and argue that the AC does not allege Defendants' direct involvement in submitting false claims, misinterpreting key law. As discussed, *supra,* the Fifth Circuit only requires Relator to allege sufficient facts to demonstrate that *one purpose* of Steward's scheme is to induce referrals because the AKS is "broadly interpreted to cover any arrangement where ***one purpose of the remuneration*** is … for the referral of services or to induce future referrals." *United States ex rel. Bruno v. Schaeffer*, 328 F. Supp. 3d 550 (M.D. La. 2018) (citing *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (emphasis added); *United States ex rel. Capshaw v. White*, No. 3:12-CV-4457-N, 2018 WL 6068806, at *1 (N.D. Tex. Nov. 20, 2018) ("As long as *any* part of the transaction was intended to induce referrals, the transaction violates the law." (emphasis in original). Here, the factual allegations specify exactly how the Individual Defendants participation in the exclusive referral scheme incentivizes, entices, or rewards referrals. *See United States v. Catholic Health Initiatives*, No. 4:18-CV-123, 2022 WL 2657131, at *9 (S.D. Tex. Mar. 31, 2022) ("[U]nder the AKS, 'the presence of a legitimate business purpose for the arrangement … will not legitimize a payment if there is *also* an illegal purpose.'") (emphasis in original).

16

The AC describes how Callum, Putter, Crowley, and Knell played a role in negotiating the partnership with First Choice. AC at ¶¶ 94-109. Further, as Callum oversaw the preparation and finalization of the Exclusive Referral Scheme, Putter, Crowley, and Knell's specific roles in the execution of the First Choice partnership are described, including their subsequent evaluation and analysis of the data from First Choice and directive to First Choice to provide more referrals. *Id.* at ¶¶133-143. The AC provides sufficient allegations particular to each Individual Defendant.

The AC alleges that Callum, as President of Steward Medical Group and Executive Vice President for Physician Services, was personally involved with the creation, approval, and facilitation of the Exclusive Referral Scheme at its inception, and was even a signatory on the agreement purchasing First Choice stock. *Id.* at ¶¶16, 91-92; 99; 104; 111. At all times, Callum knew that First Choice would refer patients to Steward so both parties would receive financial gain. *Id.* at ¶94. He participated in meetings with First Choice and reviewed term sheets, presentations and financial analysis documents to better understand how Steward would financially benefit from the referral scheme. *Id.* at ¶94-95; 97. After the deal was finalized, he tracked its progress, actively reviewing First Choice's reports and analysis. *Id.* at ¶¶126-127; 138. Callum took every measure to ensure the deal with First Choice closed. *Id.* at ¶108-109.

Crowley, Steward's Senior Vice President of Physician Network Development, an obviously integral role in physician recruitment relevant to the Exclusive Referral Scheme, was integral in the finalization of the agreement with First Choice, as he communicated the Defendants' concerns about the deal to Romandetti in order to resolve them and move it forward. *Id*. at ¶¶98; 100; 103. At one point in the negotiations, Crowley told Romandetti that the "investment" was being made in exchange for surgeries. *Id*. at ¶105. Thus, the AC clearly alleges with particularity that Crowley was integrated in the development and implementation of the Exclusive Referral

17

Scheme, even seeking out certain reports to determine the competitor hospitals that were receiving referrals instead of Steward facilities in order to develop a way to usurp them. *Id*. at ¶¶133; 136. Putter participated in negotiations through in-person meetings and email exchanges that concerned the realignment of surgeries to Steward facilities. *Id.* at ¶104.

Similarly, Putter, President of the Central Division of Steward when the scheme was formed, was involved in ensuring that referral goals were met, even holding with Sebastian River executives to discuss doctors' availability to perform surgeries at Steward facilities to manage the volume of referrals by First Choice. *Id.* at ¶133. Putter was involved in continuous discussions revolving around maximizing the benefits of the partnership, where even Romandetti told him "the only way this becomes a net positive deal for you is if we back fill his surgeries for Melbourne." *Id.* at ¶134. The AC describes that Putter often received detailed information from First Choice about where surgeries were being performed and what surgeries could be shifted to Steward hospitals. *Id.* at ¶135. A "punch list" circulated in February 2018 tasking Putter with increasing physical therapy referrals to First Choice. *Id.* at ¶139. Thus, the AC pled with sufficient particularity that Putter actively participated in the fraudulent scheme.

Knell, Steward's Regional Vice President, extensively participated in negotiations concerning First Choice's partnership proposal to realign surgeries to Steward facilities. *Id.* at ¶¶17; 104. Knell attended in-person meetings and exchanged emails with other Steward executives and First Choice executives when negotiating First Choice's proposal. *Id.* at ¶104. Knell also received a "punch list" tasking him with (a) identifying additional Orthopedic physicians in order to "hit the right ortho" to account for missing cases and specialties, (b) meeting with the Steward Rockledge hospital president to discuss a plan to increase surgical care for Steward, (c) providing profitability by case/type/physician/facility to evaluate profitability for Steward by the next

18

meeting; and (d) implement a "control tower" position that would help direct surgeries from First Choice to Steward hospitals. *Id.* at ¶125. Additionally, Knell reviewed spreadsheets containing data and analysis concerning the frequency and number of referrals First Choice pushed to Steward facilities and participated in discussions concerning the figures. *Id.* at ¶¶127; 135-136.

Each of the Individual Defendants took affirmative actions to further the goal of the Exclusive Referral Scheme between First Choice and Steward. Based upon the foregoing, there can be no question as to the willfulness of the Individual Defendants' conduct, as each individual not only reaped the financial benefit of the scheme, but helped approve, design, and implement the manner in which the fraudulent referrals would be executed.

### C. The AC Sufficiently Pled the Requisite Scienter for the Defendants.

Relator alleges that Defendants knowingly engaged in the Exclusive Referral Scheme with First Choice through a series of communications, meetings, and agreements that *actually* resulted in improper referrals in violation of the AKS. The FCA imposes liability on "any person who ... knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). According to the Fifth Circuit, Rule 9(b) "relaxes the particularity requirement for conditions of the mind, such as scienter." *United States ex rel. Carter v. Emergency Staffing Sols., Inc.,* Civil Action No. 3:19-cv-1238-E, 2023 U.S. Dist. LEXIS 56114, at *12 (N.D. Tex. Mar. 31, 2023) (quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir.1994) ("Facts that show a defendant's motive to commit the fraud may sometimes provide a factual background adequate for an inference of fraudulent intent.").

Here, the facts allow the inference of fraudulent intent, satisfying Relator's pleading burden. The AC shows that Defendants intentionally entered into a referral agreement with First Choice where, in exchange for a 15% investment, First Choice exclusively referred all lucrative patients to Steward facilities. AC at ¶2. Defendants then engaged in a series of intentional acts to

monitor the referral scheme to maximize the revenues from the improper referrals, including meetings to discuss profitability, punch lists, linkage reports, and performance. *Id.* at ¶125-133.

Accordingly, the AC described a concert of action evincing, at a minimum, an agreement and overt acts by the Individual Defendants to extract and conceal illegal kickbacks with the Exclusive Referral Scheme. In addition, the AC describes specific communications and actions to plausibly support that Defendants' agreement was more than implicit. *Id.* at ¶¶135-136. The Court is not required to make leaps, as suggested by the Individual Defendants, regarding the topic discussed during the meetings and discussions because the AC clearly explains that the entire point of the Exclusive Referral Scheme, which was eventually implemented, was for First Choice to help increase Steward revenue through "realignment" and diversion of surgeries to Steward facilities in exchange for profit. *Id.* at ¶95.

Additionally, the self-referral prohibition in the Stark Law is a strict liability offense, eliminating the scienter requirement but-for the applicable statutory exceptions. *See Emergency Staffing Sols., Inc.,* U.S. Dist. LEXIS 56114, at *12 ("If a physician is referring a patient to a DHS provider with whom the physician has a financial relationship, the referral or financial relationship must fall within one of the Stark Law's exceptions.) (citing 42 U.S.C. § 1395nn(b)-(e))). Thus, Defendants are fundamentally incorrect in their attempt to argue that they did not *knowingly* violate the Stark Law, "as is required for an FCA violation." Further, Defendants offer no arguments that the physicians' kickback arrangements were subject to the Stark Law's statutory exceptions because there are no such exceptions in this matter.

### D.  Relator Adequately Pled Stark Law Violations

A relator may bring an FCA claim based on a violation of the Stark Law, which prohibits physicians from referring Medicare patients to an entity for certain designated health services if the referring physician has a nonexempt financial relationship with such entity. *United States ex*

*rel. Bruno v. Schaeffer*, 328 F. Supp. 3d 550 (M.D. La. 2018). As part of the Exclusive Referral Scheme, Defendants, in addition to the "realignment' of surgeries exclusively to Steward facilities, also participated in physician recruitment and compensation practices that violated the Stark Law.

Defendants argue that Relator does not properly plead violations under the Stark law for failing to allege that (1) First Choice surgeons referred designated health services ("DHS") to Steward hospitals; and (2) any relevant financial relationships between First Choice surgeons and the Steward hospitals. The AC, however, sufficiently addresses both of these contentions.

First, because the defendants, through Steward, guaranteed First Choice physicians' salaries while receiving exclusive referrals from them, they were essentially paying physicians to certify the need for DHS – which constitutes a prohibited referral. AC at ¶155.

Second, the AC establishes that the physicians who performed surgery at Steward facilities have a "financial relationship" with Steward because the physicians receive remuneration from Steward and, therefore, have a "compensation relationship" with Steward. *Id.* at ¶153. Relator dedicates a significant portion of the AC to the "realignment scheme" and its resulting violations of the Stark Law. *Id*. at ¶¶153-160. By Steward guaranteeing First Choice's physician salaries while receiving exclusive referrals from them, Steward is paying the physicians to certify the need for DHS – which constitutes a prohibited referral. *Id*. at ¶155; *see also Citizens Med. Ctr*., 977 F. Supp. 2d at 667–68 (finding relators properly alleged a scheme in which ER physicians entered into improper financial relationships under Stark where they received bonus payments in exchange for referrals). The patients referred by First Choice became Steward patients and when Steward furnished DHS, it billed the services through CMS Form 1500 and was paid by Medicare and Medicaid programs.

The AC provides a specific example of this violation regarding the Suntree Internal Medicine ("Suntree") physician's contract with Steward. AC at ¶146. The Suntree physician, poached from a nearby practice, was paid a signing bonus to execute a contract requiring the doctor to refer patients to Steward facilities, establishing FCA, Stark Law, and AKS violations. *Id*. Faced with this example, the Court was not "left to guess why Relator believes the [hiring bonus] payment was unlawful," but rather Relator explains that the Exclusive Referral Scheme was embedded in the Suntree physician's agreement along with an incentivized bonus well above market price. Therefore, this example evinces the larger Exclusive Referral Scheme concocted by Defendants to submit fraudulent claims in violation of the three laws. *United States ex rel. Hernandez v. Team Fin., L.L.C.*, No. 2:16-CV-00432-JRG, 2020 WL 731446, at *6 (E.D. Tex. Feb. 13, 2020) ("Grubbs makes clear that it is the scheme, rather than individual instances of fraudulent claims, that an FCA relator must plead with particularity").

In addition, the defendants knew their partnership with First Choice would boost referrals for the Steward orthopedic practice and fraudulently allowed its physicians to accept remuneration for their acceptance of the referrals. AC at ¶167. By doing so, Defendants grew their business and reaped financial rewards by bribing physicians and submitting and causing false claims to be submitted both federally and in Florida, resulting in substantial damage to their overly-strapped healthcare systems. *Id*. Relator also sufficiently alleged its basis for stating that the defendants submitted false or fraudulent claims to Florida. Relator discusses the Steward enterprise's acquisition of the Space Coast Florida hospitals in 2017, which doubled their number of facilities, as well as the decision for First Choice to employ 11 physicians to perform surgeries at the Steward Defendants' facilities from 2017-2020—only 2 of 7 receiving less than $1 million in total and 2 receiving more than six times the Florida state average. *Id*. at ¶¶91; 132.

Taken in totality, despite Defendants repeated attempts to remove them from their context, the allegations in the AC clearly and specifically plead knowing violations of the Stark Law.

### E.  Relator Pled Particular Allegations that Claims Were Submitted to Medicare and TRICARE

The Steward Defendants wrongly contend that there is "nothing beyond speculation that federal government claims are involved" and that Relator "must plead actual examples of false claims submitted to the government..." However, it is well settled in the Fifth Circuit that the Rule 9(b) standard "is not a straitjacket" and must remain flexible "to achieve the [FCA's] remedial purpose." *United States ex rel. Sullivan v. Atrium Med. Corp.,* No. CV SA-13-CA-244-OLG, 2014 WL 12879671, at *21–22 (W.D. Tex. Dec. 31, 2014) (quoting *Grubbs,* 565 F.3d at 190).

Here, Relator's Medicare allegations are not speculative because they describe the particular details of the fraudulent scheme and are paired with reliable indicia, allowing the Court to infer that false claims were actually submitted.[2] AC at ¶¶131-132; 157. In particular, these allegations show how Medicare fee-for-service charges increased after the "strategic partnership," or Exclusive Referral Scheme, began. Relator even provides specific examples of doctors, years, and dollar amounts to support this allegation. *Id.* at ¶131. The allegations also reveal that First Choice contracted physicians to perform surgeries at Steward facilities while First Choice "caregivers" exclusively referred patients to Steward. *Id.* Steward habitually violated the Stark Law because First Choice contracted physicians had a financial relationship with Steward. *Id.* at ¶157. Consequently, each referral by a First Choice "caregiver" for a surgery to be performed at a Steward facility by a Steward-backed physician was a prohibited referral under the Stark Law. *Id.*

---

[2] Contrary to Steward Defendants' argument that Relator does not particularly allege claims were submitted to TRICARE, the AC clearly states that all allegations mentioning Medicare also include other government healthcare programs, extending the allegations to TRICARE. AC at footnote 2.

In addition, the Court should reject the Steward Defendants' attempts to question the credibility of Relator's specific examples of referrals at the pleading stage. *See Sonnier v. State Farm Mutual Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007) (under 12(b)(6), the court must accept the complaint's allegations as true and construe them in the light most favorable to plaintiff.)

### F.  Relator Adequately Pled Florida State Law FCA Claims.

To satisfy Rule 9(b), a relator must allege specific facts to indicate, with indicia of reliability, that "*an actual false claim* for payment" was made to the government. *Mastej*, 591 F. App'x at 704 (emphasis in original). A court evaluates "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Jacobs v. Bank of Am. Corp.,* No. 1:15-CV-24585-UU, 2016 WL 11653744, at *5 (S.D. Fla. Dec. 20, 2016).

The defendants blankety urge this Court to find that Relator's FFCA claims fail for the same reasons as the federal FCA claims, and because Relator does not allege that a false claim (or any claim) was submitted to Florida. However, the chart, containing specific examples of patients referred by First Choice to Steward physicians to demonstrate the Exclusive Referral Scheme, contains patient data (Patients 2 and 5) clearly implicating Florida healthcare programs and show that false claims were caused to be submitted under scheme. AC at ¶166. Defendants' arguments are without merit, but notably, as discussed herein, the level of specificity postured by Defendants simply is not required at the pleading stage. *Citizens Med. Ctr.*, 977 F. Supp. 2d at 665 ("at the pleadings stage, a relator is not required to identify particular claims resulting from the kickback scheme or plead the exact dollar amounts, billing numbers, or dates of the claims."); *see also Grubbs*, F.3d at 190 (requiring only "details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that the claims were actually submitted").

## II.   THE DEFENDANTS MISSTATE THE CAUSATION STANDARD UNDER THE AKS

At the outset, the defendants, in joining the Steward Defendants' argument that Relator's complaint should be dismissed because it failed to plead "but-for" causation under the AKS, attempt to implement a standard that has no legal support in this jurisdiction. As explained in the Government's Statement of Interest, this standard—which has not been adopted by the Fifth Circuit—is incorrect because it is inconsistent with the structure and purpose of the AKS. *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 98 (3d Cir. 2018) (rejecting "but for" standard and noting that sufficient link is established if "one of [defendant's] claims sought reimbursement for medical care that was provided in violation of the [AKS]"); *Kester*, 41 F. Supp. 3d at 332 (rejecting "but for" causation standard because "there is no indication in either the law itself or the legislative history that Congress intended to narrow the scope of 'falsity' under the FCA when it amended the AKS to add Section 1320a–7b(g)."). To avoid redundancy, Relator hereby adopts the arguments in the Statement of Interest (ECF No.93)[3] as if fully set forth herein.[4]

## CONCLUSION

As the relevant FCA provisions are constitutional, the defendants' Motions to Dismiss should be denied because Relator's Amended Complaint, when viewed in a light most favorable to Relator, satisfies the applicable *qui tam* pleading standards for claims against the Steward Defendants as well as the Individual Defendants.

Dated: March 1, 2024

Respectfully submitted,

By:     */s/ David B. Harrison*

---

[3] Relator also relies upon and adopts the Government's Statement of Interest arguments concerning the constitutionality of the FCA's *qui tam* provisions as if fully set forth herein. (ECF No. 93).

[4] If the Court is inclined to dismiss any of Relator's claims, the Court should grant Relator leave to amend. *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000)) (While dismissal of a claim is possible, a court "should not do so without granting leave to amend, unless the defect is incurable, or the plaintiff has been given repeated opportunities to replead with particularity.")

David B. Harrison (*pro hac vice*)
Svjetlana Tesic (*pro hac vice*)
SPIRO HARRISON & NELSON
363 Bloomfield Ave, Suite 2C
Montclair, New Jersey 07042
(973) 744-2100
dharrison@shnlegal.com
stesic@shnlegal.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 1st day of March 2024, I filed a copy of the foregoing memorandum of law in opposition to the motion of the Steward Defendants to dismiss the Amended Complaint with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

DATED:  March 1, 2024                    Respectfully submitted,


                                    By:      */s/ David B. Harrison*
                                             David B. Harrison (*pro hac vice*)
                                             Svjetlana Tesic (*pro hac vice*)
                                             SPIRO HARRISON & NELSON
                                             363 Bloomfield Ave, Suite 2C
                                             Montclair, New Jersey 07042
                                             Phone: (973) 744-2100
                                             Fax: (973) 232-0887
                                             dharrison@shnlegal.com
                                             stesic@shnlegal.com

                                             *Lead Counsel for Relator*


                                             David W. Henderson
                                             Texas State Bar No. 24032292
                                             ELLWANGER HENDERSON LLLP
                                             400 S Zang Blvd, Suite 600
                                             Dallas, Texas 75208
                                             Telephone: (214) 948-3334
                                             Fax: (214) 853-9410
                                             dhenderson@equalrights.law

                                             *Local Counsel for Relator*