# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF FLORIDA *ex rel.* OMNI HEALTHCARE, INC.<br><br>Plaintiffs,<br><br>v.<br><br>STEWARD HEALTH CARE SYSTEM LLC; STEWARD HEALTH CARE HOLDINGS LLC; STEWARD HEALTH CARE INVESTORS, LLC; CERBERUS CAPITAL MANAGEMENT, L.P.; STEWARD PHYSICIAN CONTRACTING, INC; STEWARD MELBOURNE HOSPITAL, INC d/b/a MELBOURNE REGIONAL MEDICAL CENTER; STEWARD ROCKLEDGE HOSPITAL, INC. d/b/a ROCKLEDGE REGIONAL MEDICAL CENTER; RALPH DE LA TORRE; MICHAEL CALLUM; DANIEL KNELL; JOSH PUTTER; TIM CROWLEY AND JAMES RENNA,<br><br>Defendants. | Case No.: 3-21-cv-0870-S |

## REPLY BRIEF IN SUPPORT OF
## STEWARD DEFENDANTS' MOTION TO DISMISS

i

Relator's Opposition defends a complaint that Relator seemingly wishes it had filed rather than the one submitted. The very first substantive sentence of Relator's brief changes the First Amended Complaint's (FAC) allegation of a "Realignment Scheme" to an "Exclusive Referral Scheme." But does the FAC allege an exclusive referral scheme? The answer is clearly no.

First, Relator repeatedly alleges that First Choice surgeons operated at local competitors throughout the relevant period, including Health First hospitals and an unnamed ambulatory surgery center. Relator alleges: "Health First, the largest healthcare system in the area . . . accounted for more than 20% of First Choice's business" (FAC ¶ 118); at least months into the alleged scheme in April 2018, First Choice surgeons were performing 121 surgeries per month at Health First (FAC ¶ 135); and First Choice surgeons seemingly performed hundreds or thousands of surgeries at an unnamed ambulatory surgery center unaffiliated with Steward (FAC ¶ 98).

Second, there is no allegation any First Choice surgeon exclusively operated at a Steward facility, let alone because of a kickback he received. Instead, Relator alleges that First Choice CEO Chris Romandetti "proposed First Choice hire a neurosurgeon who would exclusively perform surgeries at Steward hospitals, provided that Steward guaranteed the doctor's salary." FAC ¶ 94. But there is no allegation any Steward Defendant responded or agreed to implement the proposal, or that the neurosurgeon was ever hired or operated at a Steward hospital. The allegation undermines rather than supports the notion of an exclusive referral scheme.

Third, Relator asserts (at p. 10) that it has alleged that "First Choice [] exclusively refer[red]" "2,393 patients to Steward between 2018 and 2020." The apparent source for that assertion is Paragraph 164, which states "Between 2018 to 2020 [sic], First Choice referred 2,393 patients to Dr. L." Relator does not allege Dr. L was employed by a Steward entity. In fact, Relator alleges (at FAC ¶ 131) Dr. L is a "First Choice[] contracted physician." There is no allegation Dr.

1

L performed all of his or her surgeries, *or any surgery*, at a Steward facility. Plainly, a First Choice employed physician's referrals to unknown providers does not show an exclusive referral scheme between First Choice and the Steward Defendants.

Relator's inability to correctly describe the alleged scheme is indicative of the repeated errors and mischaracterizations it makes as it tries to save its inadequate FAC from dismissal.

    A.    **Relator fails to state a claim under Rule 12(b)(6).**

        1.    **Relator fails to plead causation under the Anti-Kickback Statute.**

In our opening brief (at pp. 8-11), we showed a relator must plead an AKS violation is the but-for cause of a false claim being submitted, which Relator failed to do. The government filed a statement of interest on this issue, which Relator relies on to oppose our causation argument.[1]

In 2010, Congress amended the AKS, adding that: "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for [the FCA]." 42 U.S.C. § 1320a-7b(g). "The ordinary meaning of 'resulting from' is but-for causation." *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1052 (6th Cir.); *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 836 (8th Cir. 2022) (holding "'resulting from' . . . is unambiguously causal"). If a claim did not result from an AKS violation, then it is not a false claim. No further analysis is needed. "[I]it is the words of the statute that set the metes and bounds of the [law enacted] by Congress. . . . When the language of the federal statute is plain and unambiguous, it

---

[1] Oddly, the government argues (at pp. 3-4) that this Court "does not have to determine the proper standard for causation under the AKS at the motion-to-dismiss stage." The government cites (at pp. 6-7) the Fifth Circuit's *Grubbs* case from 2009 that relies on the pre-2010 amendment version of the AKS; that is, the version that lacked subsection 1320a-7b(g). Gov't Statement at 4 (citing *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). A case interpreting the AKS before subsection 1320a-7b(g) was enacted is of little use in determining the meaning of that subsection. But in any event, *Grubbs* merely states the pleading standard for FCA claims under Rule 9(b). If but-for causation is required for liability of AKS-based FCA claims, *Grubbs* does not allow a relator to fail to adequately plead causation and yet survive dismissal.

begins and ends our enquiry." *Thompson v. Goetzmann*, 337 F.3d 489, 495 (5th Cir. 2003).

Three Courts of Appeals have decided the issue, with the Sixth Circuit and Eighth Circuit holding that subsection 1320a-7b(g) requires but-for causation, while the Third Circuit held that only a "link between the alleged kickbacks and the medical care received" by a patient is required. *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 100 (3d Cir. 2018). *Greenfield* was wrongly decided. "The [Third Circuit in *Greenfield*] court did not perform a textual analysis of the term 'resulting from,' or consider how that phrase had been interpreted in other contexts." *United States v. Regeneron Pharms., Inc.*, No. CV 20-11217-FDS, 2023 WL 6296393, at *8 (D. Mass. Sept. 27, 2023); *Cairns*, 42 F.4th at 836 (noting *Greenfield* "adopted an approach that we have already rejected: relying on legislative history and 'the drafters' intentions' to interpret the statute"); *Martin*, 63 F.4th at 1054 ("[T]he Third Circuit's contrary conclusion offers little assistance because it turns primarily on legislative history.").[2]

The government would have this Court effectively strike the "resulting from" language from the law. The government asserts (at p. 2) that departing from the plain text is justified by a contrary "contextual indication," namely that a co-sponsor of the 2010 amendment said it was meant to "strengthen whistleblower actions." This argument should be summarily rejected. *Martin* addresses this specific legislative history and rejected it because courts "do not consider legislative history in construing a statute with criminal applications, the idea being that no one should be imprisoned based on a document or statement that never received the full support of Congress and was presented to the President for signature." *Martin*, 63 F.4th at 1054. Courts "need not—and,

---

[2] The district court opinions cited by the government are no more persuasive. The quoted statement from *Hueseman*, for example, was dicta on an unbriefed issue, as "the question of whether to endorse [*Cairns*'s] causation standard is not properly before the Court" because (1) it was waived and (2) it was "inapplicable" due to the government's arguments. *United States ex rel. Hueseman v. Pro. Compounding Centers of Am., Inc.*, 664 F. Supp. 3d 722, 742 (W.D. Tex. 2023).

indeed, should not—look to legislative history when the statute is clear on its face." *Thompson*, 337 F.3d at 495. Indeed, the Fifth Circuit has held that "reliance on a statement by a co-sponsor highlights the problems with using legislative history to determine Congressional intent," in part because "this history expresses the intent of only a single member of Congress" and thus "risks . . . giving conclusive weight to a statement of only one member of Congress." *Dial One of the Mid-S., Inc. v. BellSouth Telecommunications, Inc.*, 269 F.3d 523, 526 (5th Cir. 2001).

The government also argues (at p. 5) the remuneration element already provides a "nexus requirement" for AKS claims because remuneration must be solicited or received "in return for" or offered or paid with intent "to induce" services. But that would make subsection 1320a-7b(g) a dead letter. The Sixth Circuit in *Martin* explained the but-for causation element imposes a distinct requirement, as a relator could plead an AKS violation but fail to allege causation where "the alleged scheme did not change anything" and thus fail to adequately allege an FCA violation. 63 F.4th at 1053; *see also Cairns*, 42 F.4th at 835 (explaining how alternative readings of the subsection are "hardly causal at all"). The government's statement of its policy preferences are better suited to a letter to Congress than a brief to this Court. Relator has failed to plead but-for causation (which no one disputes), and thus its claims must be dismissed.

## 2. Relator fails to plead a Stark Law violation.

In our opening brief (at pp. 11-14), we demonstrated that Relator failed to allege that the Steward Defendants violated the Stark Law for three reasons. Relator fails to respond to our arguments, refusing to apply the allegations of the FAC to the elements of a Stark Law violation.

First, Relator failed to allege that First Choice surgeons referred Designated Health Services (DHS) to Steward hospitals. DHS are enumerated 42 U.S.C. § 1395nn(h)(6) and do not include professional services, such as surgeries. *See United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 168 (3d Cir. 2019). Because Relator failed to allege any specific DHS referred to

Steward hospitals, the Stark-based FCA claims must be dismissed.

Second, Relator fails to plead any relevant financial relationship exists between First Choice surgeons and the Steward hospitals. Relator alleges in the FAC that Steward and the referring First Choice surgeons have a "direct compensation arrangement" based on SHCS's "guarantee" of First Choice surgeons' salaries (FAC ¶ 156), but Relator fails to allege that remuneration passed directly between the First Choice surgeon and the Steward hospitals. The opposition brief is silent on this point, conflating SHCS with the hospitals that furnish the DHS.

Third, Relator fails to plead that any Steward Defendant knowingly violated the Stark Law, which is required to create FCA liability. Even in its opposition brief (at p. 22), Relator merely argues that "defendants knew their partnership with First Choice would boost referrals for the Steward orthopedic practice." That is a far cry from even arguing that a Steward Defendant knowingly paid for DHS referrals, let alone including the allegation in the FAC.

Relator separately alleges that Steward's relationship with a Suntree Internal Medicine physician violates the Stark Law. But, as stated in our opening brief (at pp. 24-25), Relator fails to allege: 1) that any financial relationship existed between the Suntree physician and SHCN, the entity to which Suntree was allegedly to exclusively refer patients; and 2) Relator fails to allege that the Suntree physician referred any DHS to SHCN.

    **B.**    **Relator fails to plead FCA violations with particularity under Rule 9(b).**

        **1.**    **The Medicare and TRICARE claims are deficient.**

In our opening brief (at pp. 14-17), we showed that claims against Steward Defendants should be dismissed because Relator failed to adequately allege the scheme involves federal government claims. Relator does not respond to our arguments and instead points to yet another irrelevant, general allegation about Medicare. Relator asserts (at p. 23 (citing FAC ¶ 131)) the Medicare allegations are "not speculative" because the FAC alleges "how Medicare fee-for-service

5

charges increased after the 'strategic partnership' [began]." Paragraph 131 says "First Choice's contracted physicians saw an increase" of Medicare charges after the partnership began. Paragraph 131 does not allege that these Medicare charges were the result of surgeries performed at Steward hospitals. Steward is completely absent from the allegations in Paragraph 131.

After we demonstrated that there are no allegations of any TRICARE claims submitted by the Steward Defendants, Relator dropped a footnote (at p. 23 n.2) asserting that "the AC clearly states that all allegations mentioning Medicare also include other government healthcare programs, extending the allegations to TRICARE." How that assertion by Relator is consistent with the pleading standards of *Iqbal* and *Twombly* is a mystery. In any event, Relator is required to plead with particularity that Steward Defendants submitted TRICARE claims as part of the scheme.

Relator asserts (at p. 24) that we "question[ed] the credibility of Relator's specific examples" from Paragraph 166 of the FAC, something that is inappropriate at the dismissal phase. But pointing to deficiencies in allegations is precisely what a motion to dismiss should do. Specifically, we noted that the five specific claims alleged did not include the date of the claim or whether the surgery was performed at a Steward hospital. We asked whether the five claims were submitted in 1990, a month ago, or during the relevant period, and noted that Relator does not say. Relator still does not say. The five undated claims performed at unidentified hospitals do not help Relator's allegations move from possible to plausible. *United States ex rel. Benaissa v. Trinity Health*, 963 F.3d 733, 740 (8th Cir. 2020) (dismissing complaint that "speculate[s] that claims must have been submitted, were likely submitted or should have been submitted to the Government").

### 2. The Steward Health Care Holdings, Steward Health Care Investors, Steward Physician Contracting, and Dr. Ralph de la Torre claims fail.

In our opening brief (at pp. 17-18), we argued there were virtually no substantive

6

allegations against Steward Health Care Holdings, Steward Health Care Investors, Steward Physician Contract, and Dr. Ralph de la Torre. In response, Relator misstates the law.

Relator argues (at p. 13) "it is inappropriate to determine the relationship between defendants at the motion to dismiss stage," and a relator simply has to allege a corporate defendant is a subsidiary of another defendant to pass muster. That is obviously wrong. "The requirements of Rule 9(b) must be met for *each* defendant." *United States ex rel. Emerson Park v. Legacy Heart Care, LLC*, No. 3:16-CV-0803-S, 2019 WL 4450371, at *3 (N.D. Tex. Sept. 17, 2019) (Scholer, J.). Here, Relator (at p. 13) defends naming Steward Holdings as a defendant on the ground that it "holds all of Steward's outstanding common membership interests," Steward Investors on the grounds that it "holds all of the membership interests in Steward Holdings," and Steward Contracting on the grounds that it "is a subsidiary of [non-defendant] Steward Medical Group, Inc. and received the five million shares purchased from First Choice." Those allegations, which are all of the allegations in the FAC about these entities, reflect Relator's mistaken view (at p. 13) that it only needs to plead "their involvement in the Steward enterprise" to state claims against them.

Regarding Dr. de la Torre, he allegedly "initiated the group agenda circulated before the meeting which outlined the true intention behind the 'strategic partnership.'" Opp. at 14 (citing FAC ¶ 94). That meeting occurred a year before the stock sale and does not say Dr. de la Torre "initiated the group agenda" but instead describes Romandetti's view of the partnership without alleging how any Steward Defendant responded. FAC ¶ 94. There is also an allegation (FAC ¶ 97) of how a "potential partnership with First Choice" " might be presented to de la Torre" without ever alleging it was actually presented to him and a general allegation that every individual defendant (including Dr. de la Torre) tracked cases and urged First Choice to increase referrals (FAC 127) without explaining when or how Dr. de la Torre tracked a single surgery or had a single

7

communication with anyone at First Choice urging more referrals. These allegations fall woefully short of alleging Dr. de la Torre violated the FCA. *See Park*, 2019 WL 4450371 at *4 ("Relator's conclusory allegations that these defendants had knowledge of and participated in the FCA violations do not plead specific fraudulent conduct on their part.").

### 3. The Steward Space Coast hospitals allegations are deficient.

In our opening brief (at pp. 18-22), we detailed how the allegations against the Steward Space Coast Hospitals were sparse and inadequate. Relator (at p. 14) barely offers up a response.

Relator says the hospitals "were specifically assigned as the recipients of the illegal referral benefits" and cites Paragraphs 95 and 101. Regarding the hospitals, Paragraph 95 merely says "the Space Coast hospitals provided fertile testing ground for the success of the partnership." That general allegation gets Relator nowhere. Paragraph 101 says in October 2017 "a spreadsheet was circulated detailing how the 1,225 incremental surgeries would flow to" the three hospitals. That allegation, however, is merely a projection. There is no allegation any of these surgeries were actually performed at a Steward hospital. Paragraph 101 does not even say that the spreadsheet was circulated to anyone at Steward. Relator (at p. 14) doubles down on its group pleading, asserting "the broader scheme outlined throughout the AC applies as much to the Space Coast hospitals as the other Defendants." To quote this Court, "Does Relator not understand that [it] may not simply lump Defendants together?" *Park*, 2019 WL 4450371 at *4.

### 4. The Steward Health Care System allegations are deficient.

In our opening brief (at p. 22-23), we explained how Relator failed to adequately plead that SHCS violated the FCA. In response, Relator resorts to group pleading and incoherent arguments.

Relator asserts (at p. 15) SHCS "utilized First Choice's physician referral system." How? SHCS is a limited liability company, and an "LLC acts through its managers, employees, and agents." *Green v. Skyline Highland Holdings LLC*, No. 4:17-CV-00534 BSM, 2017 WL

8

10607256, at *3 (E.D. Ark. Dec. 13, 2017). Which SHCS employee utilized First Choice's physician referral system? Relator does not say and instead says that the FAC has three general references to "Steward Physicians." Again, though, there is no allegation that SHCS employed any practicing physician. The references in the FAC to "Steward Physicians" Relator cites make clear that Relator is simply labeling surgeons employed by First Choice as "Steward Physicians." At Paragraph 132, for example, Relator alleges "First Choice employed 11 physicians to perform surgeries at Steward facilities" and "Of the 7 orthopedic surgeons amount the First Choice/Steward physicians performing surgeries at Steward facilities . . . ." Relator never identifies any surgeons employed by Steward during the period of the alleged scheme. *See* FAC ¶ 146 (alleging Steward hired doctors from unnamed practices, seemingly in 2019 or 2020). Instead, it appears that Relator considers a First Choice surgeon to be a "Steward Physician" because Steward "guaranteed the salaries" of First Choice surgeons; Steward guaranteed First Choice surgeon salaries "by making the physician sit on the referring side as well as the treating side." FAC ¶ 130. That allegation is virtually unintelligible. Seemingly, Relator means that a First Choice surgeon has its salary guaranteed by Steward when the surgeon chooses to operate on a patient at a Steward hospital (thus both referring and treating the patient). But a surgeon at a practice (such as First Choice) that does not own a hospital with an operating room is always "on the referring side as well as the treating side." Further, Relator alleges First Choice surgeons operated at Health First hospitals; why is it not equally true that First Choice surgeons were "on the referring side as well as the treating side" for the surgeries performed at Health First? Did Health First "guarantee" First Choice surgeon salaries, too, making the surgeons "Health First Physicians"? The FAC (at ¶ 130) says an example of this arrangement was "Dr. B," but Relator merely alleges First Choice offered that Dr. B. could practice at Rockledge Hospital. There is no allegation of any Steward Defendant's

9

response or involvement in that offer or that Dr. B ever practiced at Rockledge.

Relator also argues (at p. 15) SHCS submitted "false claims for inpatient surgeries through CMS Form 1450 and the annual cost report." Does SHCS have billing and claims processing departments? Who at SHCS submitted the forms and report? The only employees of SHCS that are identified in the FAC are Dr. de la Torre, Callum, Knell, Putter, and Crowley, and there is no allegation one of them submitted these forms or reports. Relator tries to sidestep the obvious group pleading problems by asserting (at p. 16) that "Steward" is defined in the FAC to include not only SHCS but "the entire Steward Healthcare-related 'hospital chain'" including "the entire Steward operation as 'Steward Hospitals' and 'Steward hospital systems.'" Again, Relator does not seem to understand that group pleading is impermissible. Relator thus effectively admits that without lumping together all of the Steward Defendants, it cannot state a claim against SHCS.

### 5. Relator fails to plead Florida state law False Claims Act claims.

In our opening brief (at pp. 23-24), we showed that Relator fails to adequately plead Florida state FCA claims. In response (at p. 24), Relator points to one allegation: that the chart of so-called specific claims in Paragraph 166 of the FAC "implicat[es] Florida healthcare programs." In fact, Relator's response shows the inadequacy of its allegations. The FAC (at ¶ 29) alleges "claims under the Florida FCA for the Medicaid false claims alleged in this Complaint." The chart in Paragraph 166 contains no Florida Medicaid claims. The two claims in the chart that Relator points to are "Florida Medicare" claims. Plainly, alleging Florida *Medicare* claims does not indicate that any Florida *Medicaid* claims were submitted. Further, the chart does not include the date of the claims, among other deficiencies, so the allegations inadequate for many reasons.[3]

---

[3] Relator asserts (at p. 11) the five specific claims in the chart in Paragraph 166 were both "referred by First Choice and treated at Steward facilities by *First Choice-employed physicians*" and "referred by First Choice to a *Steward physician*" as part of the purported scheme. If Relator itself cannot figure out what Paragraph 166 alleges, neither can the Court or Steward Defendants.

Dated: March 15, 2024                                  Respectfully submitted,

**McDermott Will & Emery LLP**

By:     /s/ David Genender
         David Genender (Bar No. 00790757)
         Kaylynn Webb (Bar No. 24118583)
         2501 North Harwood Street, Suite 1900
         Dallas, Texas 75201
         (214) 295-8043
         dgenender@mwe.com
         kwebb@mwe.com

         Mark W. Pearlstein (admitted *pro hac vice*)
         200 Clarendon Street, Floor 58
         Boston, Massachusetts 02116
         (617) 535-4000
         mpearlstein@mwe.com

         Alexander Kritikos (admitted *pro hac vice*)
         845 Texas Avenue, Suite 4000
         Houston, TX 77002
         (713) 653-1700
         akritikos@mwe.com

         Theodore E. Alexander (admitted *pro hac vice*)
         500 North Capitol Street, N.W.
         Washington, D.C. 20001
         (202) 756-8000
         talexander@mwe.com

         *Attorneys for Steward Health Care System LLC; Steward Health Care Holdings LLC; Steward Health Care Investors, LLC; Steward Physician Contracting, Inc.; Steward Melbourne Hospital, Inc. d/b/a Melbourne Regional Medical Center; Steward Rockledge Hospital, Inc. d/b/a Rockledge Regional Medical Center; Sebastian River Hospital, Inc. d/b/a Sebastian River Medical Center; and Ralph de la Torre*

## CERTIFICATE OF SERVICE

      I hereby certify that on March 15, 2024, I electronically filed the foregoing document using the Court's ECF system, which will send notice of the filing to all counsel of record via e-mail.

      /s/ David Genender
      David Genender